## GREASE MONKEY INTERNATIONAL, INC.

v.

### Brent L. WATKINS.

### Civ. No. B–90–511(TFGD).

United States District Court, D. Connecticut.

May 14, 1992.

---

112

Lewis K. Wise, Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, CT, for plaintiff.

Richard L. Albrecht, Richard Slavin, Cohen & Wolf, P.C., Bridgeport, CT, for defendant.

## RECOMMENDED RULING ON PENDING DISPOSITIVE MOTIONS

MARGOLIS, United States Magistrate Judge.

On October 10, 1990, plaintiff Grease Monkey International, Inc. ["GMI"], commenced this diversity action against defendant Brent L. Watkins ["Watkins"], alleging that Watkins violated a franchise agreement ["Franchise Agreement"] under which GMI was the franchisor and Watkins the franchisee. In Count One of its complaint, GMI seeks payment for royalty fees, advertising fees, interest and attorneys' fees under the Franchise Agreement. In Counts Two and Three, GMI seeks injunctive relief for Watkins to cease operations and to comply with the non-competition clause, respectively. On July 26, 1991, Watkins filed his answer, affirmative defenses, and counterclaim (Dkt. # 24).

There are presently three dispositive motions pending before the Court. First, on December 18, 1991, GMI filed a motion for partial summary judgment, brief in support, Local Rule 9(c) Statement ["GMI's Statement"], and affidavit of counsel, with

respect to Counts Two and Three (Dkt. ## 38–40).[1] On that same date, Watkins filed a motion to dismiss for lack of diversity jurisdiction and a motion for partial summary judgment with respect to Counts Two and Three, brief in support of both motions, Local Rule 9(c) Statement ["Watkins' Statement"], and his affidavit ["Watkins Aff't"] (Dkt. ## 41–44).[2] On January 24, 1992, Watkins filed a brief in opposition to GMI's summary judgment motion, as well as a supplemental Rule 9(c) Statement (Dkt. # 49–50). On that same date, GMI filed its brief in opposition to Watkins' two motions, with a supplemental Local Rule 9(c) Statement (Dkt. # 51–53).[3] On February 10, 1992, Watkins filed a reply brief (Dkt. # 54).

For the reasons stated below, Watkins' motion to dismiss is *denied*, GMI's motion for partial summary judgment is *granted*, and Watkins' motion for partial summary judgment is *denied*.

## I. FACTUAL BACKGROUND [4]

Plaintiff GMI is a Colorado corporation which sells franchises throughout the United States, which franchises offer fast automotive lubrication services under GMI trademarks and which use GMI's licensed methods. (Complaint ¶ 1). Defendant Watkins, a Connecticut resident, operated at all pertinent times and continues to operate such a business, in Bridgeport, Connecticut ["the business"]. (*Id.* ¶ 2).

The following facts appear to be undisputed: The parties entered into the Franchise Agreement on September 17, 1985, and Watkins opened for business on April 8, 1987. (*Id.* ¶¶ 5–6; GMI's Statement ¶¶ 1–2; Watkins' Statement ¶¶ 1 & 3). The Franchise Agreement required Watkins to pay GMI royalty and advertising fees based on a percentage of the total gross receipts for the previous month. (Complaint ¶ 7–8; GMI's Statement ¶¶ 4–5; Watkins' Statement ¶ 4; Franchise Agreement Arts. 12–13). Watkins ceased paying those fees sometime around December 1987 (Complaint ¶ 10; GMI's Statement ¶¶ 4–5; Watkins' Statement ¶ 5),[5] and therefore owes GMI a disputed amount of money (*see* Franchise Agreement ¶ 32.01).[6]

At some point after default, Watkins received two letters from GMI terminating the franchise, unless default was cured

1. The following exhibits were attached to the affidavit: copy of the Franchise Agreement (Exh. A); excerpts from the deposition transcripts of Watkins and John Piper (Exhs. 1 & 3, respectively); letter, dated July 10, 1990, from GMI's counsel to Watkins (Exh. 2).

2. The following six exhibits were attached to Watkins' brief: additional excerpts from Piper's deposition (Exh. 1); demographic profile of Bridgeport, Connecticut (Exh. 2); letter, dated June 7, 1990, from GMI to Watkins (Exh. 3); another copy of the letter, dated July 10, 1990, *see* note 1 *supra* (Exh. 4); additional excerpts from Watkins' deposition (Exh. 5); and list of sales figures from April 1987 to December 1990 (Exh. 6).

   The following exhibits were attached to Watkins' Affidavit: an additional copy of the Franchise Agreement (Exh. A); list of royalties and advertising fees proposed by Watkins with the sales journals from December 1987 to September 1990 (Exh. B); letter, dated March 12, 1990, from GMI to Watkins (Exh. C); and additional letter, dated March 12, 1990, sent by certified mail, return receipt requested (Exh. D).

3. The exhibits attached to this brief were: yet another copy of the July 10, 1990 letter, *see* notes 1–2 *supra* (Exh. 1); and a second affidavit of counsel. The original of this supplemental affidavit was filed on February 4, 1992 (Dkt. # 53).

4. Because Watkins filed an answer, his motion is more appropriately a motion for judgment on the pleadings under Rule 12(c). The same standards are employed for dismissing a complaint under Rule 12(c) as under Rule 12(b)(6). *Ad-Hoc Committee of the Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987); *Losacco v. City of Middletown*, 745 F.Supp. 812, 814 (D.Conn. 1990).

   In reciting the factual background, reference will be made both to the complaint and to the parties' Local Rule 9(c) Statements, as this ruling must address a Rule 12(c) motion and Rule 56 motions.

5. GMI also claims that Watkins failed to disclose certain financial information required by the Franchise Agreement. (Complaint ¶¶ 9–10; GMI's Statement ¶ 3).

6. GMI estimates that the debt is $35,000, including interest, whereas Watkins claims that only $23,921.65 is owed. (Complaint ¶¶ 11–12; Watkins' Statement ¶ 6). GMI also claims that it is entitled to attorneys' fees. (Complaint ¶ 13).

within ten days. (Complaint ¶¶ 15–16; GMI's Statement ¶ 6; Watkins' Statement ¶ 7).[7] Watkins continues to operate the business using GMI's trademark, processes, materials, signs, manuals, name, and methods (Complaint ¶ 18; GMI's Statement ¶ 7; Watkins' Aff't ¶ 15).

## II. DISCUSSION

### A. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

■ In ruling on a motion for judgment on the pleadings,[8] the court "must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir.1989) (citation omitted). A court may not dismiss the complaint unless the plaintiff apparently cannot, beyond a doubt, prove the facts to support his claim. *Id.*

■ Watkins seeks dismissal of GMI's complaint on the ground that the amount in controversy does not exceed $50,000, as required by 28 U.S.C. § 1332(a), for the following reasons: (1) that the total unpaid royalties and advertising fees are $23,921.65, not $35,000 as GMI estimated in its complaint; (2) that interest cannot be calculated into the jurisdictional amount;[9] (3) that whether GMI may include attorneys' fees in the jurisdictional amount is questionable, and regardless, attorneys' fees for a $23,921.65 claim could not reasonably amount to over $26,000; and (4) that any damages claimed in GMI's second and third counts are speculative because GMI could have sold another franchise in Bridgeport, and GMI has put no value on its alleged loss of goodwill.

Fifty years ago, the United States Supreme Court held:

[t]he sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. . . . But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. . . .

*St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (multiple footnotes omitted). *See also Stack v. Dick Corp.*, Civ. No. H89–545 (AHN) (D.Conn. Dec. 22, 1989); *Schreiber v. Blankfort*, 76 F.R.D. 474, 476–77 (D.Conn.1977); *Leblanc v. Spector*, 378 F.Supp. 301, 305–08 (D.Conn. 1973). The late Judge Blumenfeld, in *LeBlanc, supra*, described the "general rule laid down in *St. Paul* as

clearly afford[ing] the plaintiff, not the defendant, the initiative in speculating as to the amount the plaintiff may be entitled to recover. In order successfully to controvert the plaintiff's claim of the jurisdictional amount, the defendant must either demonstrate the legal impossibility of the plaintiff's recovering the jurisdictional amount, or show that the plaintiff's initial speculation as to his possible recovery was made in bad faith. . . .

378 F.Supp. at 306. *See also Buckholtz v. Voice for International & Domestic Adoptions, Inc.*, Civ. No. N90–718 (TFGD), slip op. at 7 (D.Conn. July 8, 1991, Magistrate Judge's ruling approved July 29, 1991) ("At this early stage of the proceeding, it does not appear *to a legal certainty* that plaintiff's claim is less than the jurisdictional amount. . . .") (emphasis added).

---

**7.** Watkins contends that he received the first letter, dated March 12, 1990, on April 17, 1990, and the second letter, dated May 1, 1990, sometime in May. (Watkins' Aff't ¶ 11). Apparently, two additional letters, dated June 7, 1990 and July 10, 1990, were mailed to Watkins (Watkins' Exhs. 3–4). Although Watkins' employee signed for one of the letters, which advised of the termination of the franchise, Watkins claims he never received either of the letters. (Watkins' Depo. Tr. at 38–39; Watkins' Aff't ¶ 11).

**8.** *See* note 4 *supra.*

**9.** The court need not address this issue, as GMI reaches the jurisdictional minimum, even excluding interest.

Watkins has not alleged that GMI acted in bad faith, and his claim that only $23,921.65 is owed, rather than $35,000, is not dispositive, as plaintiff has alleged other amounts which may bring the total within the jurisdictional minimum. Thus, Watkins has not met the burden imposed by *St. Paul*—that it is clear to a legal certainty that GMI could not recover the jurisdictional minimum.

With respect to attorneys' fees, Watkins concedes that such fees may be included within the jurisdictional amount when plaintiff has a contractual right to such fees; his argument is that under the language of the Franchise Agreement, attorney's fees are indistinguishable from "costs and expenses." [10]

A similar argument was rejected in *Perma Glass Corp. v. Sasak Corp.*, 718 F.Supp. 742 (E.D.Mo.1989), regarding contractual language [11] much like that at issue here:

> Attorney's fees are included in the computation of the jurisdictional amount when they are an item of damages recoverable under a contract in the event of a breach. Defendant has offered no authority in support of its rather formalistic argument that the contractual designation of attorney's fees as recoverable "costs" rather than damages alters this settled proposition of law.

*Id.* at 743–44 (multiple citations omitted).[12]

Watkins further argues that even if attorneys' fees can be included in the jurisdictional amount, only an unreasonable amount of fees would put GMI beyond the $50,000 jurisdictional minimum. GMI counters that given that damages and injunctive relief are sought, fees could easily exceed $20,000; the court agrees, particularly in view of substantial activity which already has occurred in a file which is but eighteen months old.

Lastly, Watkins argues that GMI's last two counts, which seek injunctive relief and damages for Watkins' continuous operation of the business, are speculative and thus cannot be included in the jurisdictional amount. "Where the plaintiff seeks injunctive relief, the value of his claim is generally assessed with reference to the right he seeks to protect and measured by the extent of the impairment to be prevented by the injunction." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87, 88 (2d Cir. 1991) (citations omitted). GMI posits that the value of the relief would be $25,000, as it would then be able to sell another franchise in the area. (Complaint ¶¶ 19–20). Additionally, although GMI did not place a value on its goodwill (*id.* ¶ 19), if its allegations are true, it may have incurred some loss of goodwill, not to mention damages from Watkins' alleged violation of the non-competition clause. It is not critical to calculate that final amount, because with the royalty and advertising fees in the range of $25,000–35,000, injunctive relief estimated to be at least $25,000, and reasonable attorneys' fees, GMI has exceeded the jurisdictional minimum.

Thus, in viewing the pleadings in the light most favorable to plaintiff, *Madonna, supra*, 878 F.2d at 65, at this early stage of the proceedings, the court cannot conclude that Watkins has shown, to a legal certainty, that plaintiff cannot reach the jurisdic-

---

**10.** Paragraph 32.01 of the Franchise Agreement provides:

> In the event of any default on the part of either party to this Agreement, ... the party in default will pay the aggrieved party all amounts due and all damages, costs and expenses, including reasonable attorney's fees, incurred by the aggrieved party as a result of such default, plus interest at the highest rate allowable by law.

**11.** The contract at issue in *Perma Glass* provided that plaintiff was entitled to recover " 'all costs' of any action instituted to enforce the agreement, 'including a reasonable attorney's fee.' " *Id.* at 743.

**12.** Watkins relies upon *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1069 (5th Cir.1984), *reh. denied on other grounds*, 759 F.2d 504 (5th Cir.1985), which refused to include attorneys' fees as part of the jurisdictional amount. This case is easily distinguishable, in that it arose under the Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301–12, which specifically provides in § 2310(d)(3) that the amount in controversy is to be calculated "exclusive of interest and costs."

tional limit. Accordingly, Watkins' motion for judgment on the pleadings is *denied.*

### B. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

GMI has moved for partial summary judgment on Counts Two and Three on the grounds that it is undisputed that Watkins defaulted on his fee payments, GMI properly terminated the franchise, and as a result, injunctions should be granted requiring Watkins to cease operating the business and to comply with the non-competition clause, in accordance with the Franchise Agreement. While Watkins concedes that there is no dispute as to the dates of the termination letters or the substance of the non-competition clause, he nonetheless argues that there is a dispute as to whether the law allows an action to proceed based on these undisputed facts.

#### 1. Notification of Termination

■ Watkins claims because GMI did not give him sufficient notice, termination was never accomplished, thereby precluding the injunctive relief sought by GMI. Watkins claims that although GMI knew of Watkins' default since approximately January 1, 1988, it waited until November 9, 1989 to notify him of such.[13] Such notice, Watkins argues, was not in accordance with the Connecticut Gasoline Dealer's Act ["CGDA"], Conn.Gen.Stat. §§ 42–133j to –133n,[14] specifically § 42–133*l*(f)(10) which provides:

> No franchisor ... shall ... notify the franchisee of a claimed breach of franchise agreement for good cause later than one hundred eighty days from the date said good cause arises or one hundred eighty days after the franchisor knew or in the exercise of reasonable

care should have known of said claimed good cause.

Section § 42–133e(b) defines a franchise for purposes of this act as:

> [A]n oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing motor vehicle fuels and oils and other related products and offering or selling services associated with such products and with gasoline service stations under a marketing plan or system prescribed in substantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily for its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer.

GMI contends that because it is not a petroleum product franchise under CGDA, it is not subject to its notice requirements. Neither counsel cited any authority as to whether a fast automotive lubrication business is subject to CGDA, nor could this Court find any.[15] Thus, the pertinent legislative history must be examined.

---

**13.** It is unclear whether Watkins also received notice in November 1989, prior to the two letters he received in April and May 1990. *See* note 7 *supra* and accompanying text.

**14.** *See generally Gangemi v. Mobil Oil Co.,* Civ. No. B88–525(TFGD), slip op. at 18–20 (D.Conn. Apr. 21, 1989), *on reconsideration,* slip op. at 7–9 (D.Conn. June 15, 1989); Farrell, *Franchising in Connecticut—"Can Anybody Here Play This Game?,"* 54 CONN.B.J. 446, 459–63 (1980).

**15.** Decisions within this district and in the state courts have discussed other aspects of § 42–133e(b) to determine if a franchise was present for purposes of this act. *See, e.g., Ackley v. Gulf Oil Corp.,* 726 F.Supp. 353, 364–67 (D.Conn.), *aff'd per curiam,* 889 F.2d 1280 (2d Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990); *Aurigemma v. Arco Petroleum Products Co.,* 698 F.Supp. 1035, 1038–40 (D.Conn.1988), *on reconsideration,* Civ. No. H85–683 (PCD) (D.Conn. Feb. 1, 1989); *Con-*

The legislative intent of the Connecticut General Assembly in enacting this act is set forth at great length in Conn.Gen.Stat. § 42–133j(a), which provides in pertinent part:

> The legislature of the state of Connecticut finds and declares that the distribution and sales of gasoline and petroleum products through franchises within the state of Connecticut, including the rights and obligations of suppliers and dealers, vitally affects its general economy. In order to promote the public interest and public welfare, to avoid undue control of the dealer by suppliers, ..., to prevent deterioration of facilities for servicing motor vehicles on the highways of the state, to prevent dealers from unnecessarily going out of business ..., and to offset evident abuses within the petroleum industry as a result of inequitable economic power, it is necessary to legislate standards pursuant to the police power of this state governing the relationship between suppliers and distributors of gasoline and petroleum products and the dealers within the state who sell those products to the public.

*See also Darling v. Mobil Oil Corp.*, 864 F.2d 981, 985 (2d Cir.1989); *Mobil Oil Corp. v. Karbowski*, 667 F.Supp. 927, 934 (D.Conn.1987), *aff'd on other grounds*, 879 F.2d 1052 (2d Cir.1989). Such a developed "statement of legislative intent appears to be unique within the Connecticut General Statutes." 54 CONN.B.J. at 459.

It is further evident from the legislative history itself that the purpose of CGDA was to protect independent gasoline retailers from mistreatment by major oil companies. The history is replete with legislators' statements about the need to protect gasoline retailers. For example, then Senator Lawrence DeNardis explained:

> [T]he conditions under which gasoline retailers operate—I have seen retailer after retailer ...—shabbily tr[e]ated. Very poorly treated, driven out of business, driven out at one location, having to look for another location and in the

*sumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 452 A.2d 123 (App.Sess.Su-

> meantime lo[ ]sing—lo[ ]sing money for themselves and for their families.

> I think there is no group of businessmen in our State and perhaps the nation, who have been as badly treated in a business relationship as gasoline retailers. And anything we can do, within reason and good bounds, good taste, to help *this group* of businessmen, I think is certainly worthy and will be appreciated by them.

20 S.Proc., Pt. 9, p. 3418 (1977 Sess.) (emphasis added). Another senator added: "I know people today who have been put out of business because of the way that they are being treated by the people *who supply them—the petroleum people.*" *Id.* at 3419 (emphasis added). Senator Howard Owens also observed: "I can't think of a group that's been more maligned and been more oppressed than *this particular group*—the gasoline station proprietors...." *Id.* at 3420 (emphasis added).

Similar sentiments were expressed by numerous members of the House of Representatives as well, including the following:

> The purpose of this act is to strengthen the position of the independent petroleum retailer in Connecticut in order to preserve competition in the marketplace in order to help keep down prices for automotive products. This bill represents the concern of the general law committee that *the major oil companies* are trying through unfair business practices to further control the supply and distribution of gasoline and related products for the sole purpose of increasing profits through increasing their prices.....

> [Numerous Congressional studies] ... found that oil companies are using ... abusive practices in order to drive petroleum retailers out of the market for the sole purpose of having further control of petroleum products. [These studies] found that dealers are being coerced into buying tires, batteries, and accessories at

per.Ct.1982).

higher prices from *the major oil companies* than they could buy them on the wholesale market....

20 H.R.Proc., Pt. 9, pp. 3480–81 (1977 Sess.) (emphasis added).

Clearly, as the name itself suggests, the goal of the Connecticut Gasoline Dealer's Act was to protect gasoline dealers; in fact it was primarily through the efforts of the Gasoline Retailers Association that the bill was enacted. 54 CONN.B.J. at 459. Watkins' business is not a retail gas station; GMI is not a major oil company. Furthermore, the situation sought to be protected by CGDA is not even remotely evident here—GMI has no stranglehold on the business such that it forces Watkins to purchase GMI's products at exorbitant prices.[16] Likewise, for the reasons stated above, Watkins' argument that GMI has failed to comply with § 42–133*l*(b) must also fail.

### 2. The Non–Competition Clause

Watkins also argues that the non-competition clause found in ¶ 26 of the Franchise Agreement is unenforceable. This paragraph provides in pertinent part:

> Franchisee therefore agrees that in the event the franchise is ever terminated ... for whatever reason, franchisee shall not engage in a fast service automotive lubrication business, either directly or indirectly, within a radius of 50 miles of the location of franchisee's franchised business, for a period of two years, either as an employer, employee, stockholder, limited partner, partner or in any other manner....
>
> Franchisee acknowledges that [GMI] may, in addition to other legal remedies available, obtain an injunction to enforce the covenants herein....

Watkins insists that the covenant is particularly unenforceable when read in conjunction with ¶ 2.02 of the Franchise Agreement, which provides that GMI "shall not grant another franchise or open a company owned location within a radius necessary to encompass 75,000 persons of the licensed location." Watkins argues that since GMI could have sold another franchise "practically next door" to his business [17] under ¶ 2.02, the geographical restriction placed on GMI should be the maximum restriction placed on him, and that any broader restriction is unconscionable.

GMI responds that the purpose of ¶ 2.02 is quite different from the covenant in that it seeks to protect one GMI franchisee against competition from another GMI franchisee by providing each with an exclusive territory; the covenant on the other hand, protects GMI against unfair competition from a former franchisee who has knowledge of its unique methods and customers.[18] GMI asserts that the average franchise attracts customers within a twenty-five mile radius and therefore the fifty-mile non-competition limitation is necessary to provide competitive protection within that 25–mile radius. Watkins cites no authority to support his proposition that if ¶ 2.02 is fair for GMI, anything more restrictive is unfair to him. Furthermore, the court agrees with GMI that the covenant and ¶ 2.02 serve vastly different purposes and thus should not be compared.

Watkins insists that the "reasonable standard" here is, at maximum, a location within a radius to serve 75,000 people. As the Franchise Agreement specifically provides in ¶ 30 that such agreement is to be determined in accordance with Connecticut law, it is this state's law which should be

---

**16.** Paragraph 11 of the Franchise Agreement provides in pertinent part that the franchisee "shall purchase its entire requirements of products, equipment and materials used and/or sold through its Franchised Business in accordance with Grease Monkey's standards and specifications and only from suppliers approved in advance by Grease Monkey.... Grease Monkey shall not unreasonably withhold its approval of a supplier of Franchisee's choosing, provided that such supplier meets the published standards regarding the products to be purchased."

**17.** Watkins presumably bases his assertion on a demographic profile given him in 1985 by GMI; this profile estimates that in 1985, the population, within a three mile ring of the Bridgeport franchise location, was 173,019. (Watkins' Exh. 2).

**18.** Watkins disputes that GMI has any unique methods or customer lists. (Watkins' Statement ¶ 15).

applied to determine whether the non-competition clause is reasonable. Although Watkins has cited several cases for the court's consideration, they construe the law of other states,[19] and, in light of the existence of applicable Connecticut cases, are not persuasive here.

In Connecticut, for a restrictive covenant to be binding, its time and geographical restrictions must be reasonable, partial and restricted. *Scott v. General Iron & Welding Co., Inc.*, 171 Conn. 132, 137, 368 A.2d 111 (1976). In approving the five year and statewide restriction, the Connecticut Supreme Court considered that the defendant company, which fabricated and welded metals, did business in twenty-five to seventy-five Connecticut towns, that its customers numbered more than one thousand and were located throughout the state, and that it took defendant years to acquire its customers. 171 Conn. at 138–39, 368 A.2d 111.

The *Scott* decision was discussed in detail in *Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 546 A.2d 216 (1988), in which plaintiff's employment agreement with defendant prohibited plaintiff from engaging in the commercial insurance business within a ten mile radius of Stamford for two years after his termination as an insurance salesman. The Connecticut Supreme Court summarized the factors to be applied under *Scott* as follows:

> (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests.

208 Conn. at 529 n. 2, 546 A.2d 216 (*citing Scott, supra*, 171 Conn. at 137, 368 A.2d 111). In applying these standards, the Court found that the covenant was reasonable in that the two year limitation "fairly protected the plaintiff's interests in the commercial insurance business in the Stamford area while ensuring that Wiederlight could return to commercial insurance in that area within a definite period of time" and that "the restricted geographical area was narrowly tailored to the plaintiff's business situation in the Stamford area." 208 Conn. at 531, 546 A.2d 216 (*citing Scott, supra*, 171 Conn. at 140, 368 A.2d 111). *See also Hart, Nininger & Campbell Associates, Inc. v. Rogers*, 16 Conn. App. 619, 635–37, 548 A.2d 758 (App.Ct. 1988) (upholding two year restriction in defendant's "Territory," which covered New England and portions of New York and New Jersey, in that plaintiff-employer sold highly specialized products); *Spitz, Sullivan, Wachtel & Falcetta v. Murphy*, Dkt. No. 322422, 1991 Conn.Super. LEXIS 1394, at *15–22 (Super.Ct. June 13, 1991) (upholding two year restriction within Connecticut on C.P.A.'s ability to solicit work from clients of former partnership, as not unduly restricting his pursuit of his profession).

The covenants in the above-mentioned cases are far different from that at issue in *Gartner Group Inc. v. Mewes*, Dkt. No. 118332, 1992 WL 4766, 1992 Conn.Super. LEXIS 38 (Super.Ct. Jan. 3, 1992), where the plaintiff-computer company restricted its employees from similar work, for a twelve-month period, "at all geographical areas" where the employee performed work for plaintiff, "at all other places where [plaintiff] does business and/or did business during the term of [the employee's] employment, including, but not limited to the States of Connecticut, New York, and Massachusetts, and at all places where ... [plaintiff] ha[s] plans or reasonable expectations to do business in the future." The trial judge had little difficulty in recognizing the "serious infirmities" in the geographic restrictions, which were "vague and indefinite," "entirely subjective and changeable at the caprice of the employer," and "totally unlimited." 1992 WL 4766 at *2–3, 1992 Conn.Super. LEXIS 38 at *8–10.

---

19. *Scott v. Snelling & Snelling, Inc.*, 732 F.Supp. 1034 (N.D.Cal.1990) (California law); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 493 P.2d 205 (1972) (Kansas law); *Upgrade Educational* *Services, Inc. v. Cheryl Rappaport, et al.*, CCH Business Franchise Guide ¶ 9.39 (N.Y.App.Div. 1988) (New York law).

In light of testimony that a significant portion of the plaintiff's business was derived from Connecticut, New York, and Massachusetts, the court held that "these three states comprise a reasonably limited market area ... and therefore comprise a valid restriction." *Id.* 1992 WL 4766 at *4, 1992 Conn.Super. LEXIS 38 at *12.

Watkins objects not to the two year restriction, but only to the geographic one. Although fifty miles seems somewhat broad, the court does not find it to be unreasonable, especially in light of *Scott* and the other cited decisions, where a statewide restriction was upheld. In applying the other *Scott* factors, it was fair for GMI to attempt to protect its trademark and business practices, and to seek to maintain or establish relations with its present and potential customers. The extent of the restraint on Watkins is not overbearing, nor is it infinite, *Weiss, supra*, 208 Conn. at 531, 546 A.2d 216, in sharp contrast to the non-competition provision in *Gartner Group, supra*. Furthermore, the covenant in no way interferes with the public's interest. Watkins entered into the Agreement fully aware of its terms; as his argument that GMI did not timely terminate the agreement must fail, he is thus subject to the consequences of termination. He cannot ask this court to excuse him from complying with terms of the Franchise Agreement to which he agreed.

Accordingly, GMI's motion for partial summary judgment is *granted* and Watkins' motion for partial summary judgment is *denied.*

### III. CONCLUSION

For the reasons stated in Part II.A. *supra*, defendant Watkins' motion to dismiss (Dkt. # 43), construed as a motion for judgment on the pleadings, is *denied*, Watkins' motion for partial summary judgment with respect to Counts Two and Three (Dkt. # 43) is also *denied*, and plaintiff GMI's motion for partial summary judgment with respect to Counts Two and Three (Dkt. # 38) is *granted.*

*See* 28 U.S.C. § 636(b) (*written objections to ruling must be filed within ten days after service of same*); F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS*, 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).