**Peter and Ronda AURIGEMMA, d/b/a Auri, Inc./Arco AM–PM Mini–Market, et al.**

v.

**ARCO PETROLEUM PRODUCTS COMPANY, et al.**

**No. Civ. H–85–683 (PCD).**

United States District Court, D. Connecticut.

Oct. 26, 1988.

John J. LaCava, Farrell & Barr, Stamford, Conn., for plaintiffs.

Robert Keepnews, William S. Fish, Jr., Tyler, Cooper & Alcorn, Hartford, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

### I. *Facts and Procedural History*

Plaintiffs operated gasoline stations and convenience stores pursuant to an "AM–PM Mini Market Agreement" and "Lessee Dealer Gasoline Agreement" with defendant Arco. By letter dated May 21, 1985, Arco informed plaintiffs that it intended to terminate each respective petroleum and convenience store operation as of November 30, 1985. The reason given for this termination was Arco's intended withdrawal from the marketing of motor fuel in Connecticut under 15 U.S.C. § 2802(b)(2)(E) of the Petroleum Marketing Practices Act ("PMPA").

Subsequent to the notice of termination, Arco contracted with Shell Oil Co., whereby Shell agreed to purchase numerous properties owned by Arco, including those leased to plaintiffs. Shell then offered plaintiffs a new Motor Fuel Station Lease, Convenience Store Lease, and Dealer Agreement for the same location. Plaintiffs accepted Shell's offer and in November 1985 Arco terminated its agreements with plaintiffs.

Plaintiffs had commenced this action in August 1985 seeking to enjoin Arco's market withdrawal as violating the PMPA. Plaintiffs have withdrawn their request for injunctive relief but presently allege:

1. Entitlement to good will and inventory compensation under the Connecticut Fair Conduct in Franchising Act ("CFCFA"), Conn.Gen.Stat. § 42–133*l* (b).

2. Unfair trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110b.

3. Breach of contract in the termination of the AM–PM Mini Market Agreement.

4. Fraud.

5. Unjust enrichment.

Pending are cross-motions for summary judgment on Counts One and Three.

### II. *Summary Judgment*

Fed.R.Civ.P. 56(c) provides, in part, that summary judgment shall be rendered only when a review of the entire record demonstrates "that there is no genuine issue as to any material fact." The burden falls on the moving party to establish that no relevant facts are in dispute. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975); *accord Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Moreover, in determining whether a genuine issue has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 443 (2d Cir.1980). Therefore, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313 (2d Cir.1981); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Properly employed, summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). It must, however, be used selectively to avoid trial by affidavit. *Judge v. Buffalo*, 524 F.2d 1321 (2d Cir.1975). Hence, the fundamental maxim remains that on a motion for summary judgment a court "can-

not try issues of fact; it can only determine whether there are issues to be tried." *Heyman*, 524 F.2d at 1319–20. As long as the [non-moving party] has adduced sufficient facts to substantiate the elements of his claim, summary judgment is inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57–58 (2d Cir.1987).

A. *Count One*

In Count One of their third amended complaint, plaintiffs claim good will and inventory compensation under CFCFA, § 42–133*l* (b), based on their November 30, 1985 termination from the Lessee Dealer Agreement.

1. Preemption

■ Initially, defendants argue that the PMPA, 15 U.S.C. § 2801, *et seq.*, preempts Conn.Gen.Stat. § 42–133*l* (b). They question *Bellmore v. Mobil*, 783 F.2d 300 (2d Cir.1986) in light of the recent Fourth Circuit decision in *Jimenez v. BP Oil, Inc.*, 853 F.2d 268 (4th Cir.1988) (Maryland good will payment provision similar to § 42–133*l* (b) was held preempted by the PMPA).

The Fourth Circuit distinguished *Bellmore* on several grounds. First, *Jimenez* involved a market withdrawal rather than the franchise non-renewal in *Bellmore*. Second, the plaintiffs in *Jimenez*, as in the case here, were not "deposed franchisee[s]" as was Bellmore. *Id.* at 273. The plaintiffs in *Jimenez* were offered franchises with the defendant franchisor's successor. The court held that compensation for good will on such facts would constitute a penalty. *Id.* at 272. No deprivation of good will was found, since defendant had withdrawn and any good will remained with the plaintiff franchisees.[1]

Irrespective of the factual similarities between the case at hand and *Jimenez*, the *Bellmore* grounds/effects rationale remains the law in this circuit. *Bellmore*, 783 F.2d at 305. Limiting the reach of

*Bellmore*, absent sound distinction, must be the decision of the Second Circuit. *Herman v. Charter Marketing Co.*, 692 F.Supp. 1458 (D.Conn.1988), Ruling on Pending Motions at 11.

Congress has been held to have left the compensation of good will arising from the franchise relationship within the control of the states. *Bellmore*, 783 F.2d at 305. PMPA "preempts only state statutes as to grounds for, procedures for, and notification with respect to termination." *Id.* at 304. The good will provision of the Connecticut Act is not state law applicable to the grounds for termination but simply one element of the compensation to be paid on termination. *Id.* at 305. Thus, § 42–133*l* (b) is not preempted by the PMPA.

2. Applicability of CFCFA

Section 42–133*l* (b) limits good will compensation to parties to a franchise. "Franchise" is defined in § 42–133k(b) as an agreement granting "the right to engage in the business of offering, selling or distributing motor vehicle fuels and oils ... under a marketing plan or system prescribed in substantial part by a franchisor."

■ Plaintiffs initially argue that a "franchise" can be established under § 42–133*l* (b) without proof of the existence of a "marketing plan," relying on § 42–133k(b) which provides in part that a "franchise ... includes any agreement between a ... refiner ... and a retailer." This language does not excuse plaintiffs from establishing the elements which constitute a franchise. The last quoted language was added to prevent petroleum refiners from avoiding the embrace of the definition of franchise by dealing through intermediaries. *See Muha v. United Oil Co.*, 180 Conn. 720, 729–30 & n. 5, 433 A.2d 1009 (1980). Further, the finding of a franchise relationship has been held to be dependent upon proof of the existence and imposition of a marketing plan. *See Consumers Petroleum of Connecticut, Inc. v. Duhan*, 38 Conn.Sup. 495, 452 A.2d 123

---

**1.** The Second Circuit characterized § 42–133*l* (b) as a compensatory rather than a penal stat-

ute. The franchisor would be liable only for proven good will. *Bellmore*, 783 F.2d at 306.

(1982); *Narumanchi v. Shell Oil Co.*, Civil No. N–83–544 (D.Conn. Nov. 24, 1986), Findings of Fact and Conclusions of Law; *Ross v. Shell Oil Co.*, 672 F.Supp. 63 (D.Conn.1987). Accordingly, plaintiff must prove the existence of a "marketing plan" in order to bring their agreement under the CFCFA as a franchise.

There is no precise formula to determine when the control exercised by a producer is sufficient to constitute a marketing plan or system prescribed in substantial part by a franchisor. Several factors are relevant to this determination. *See, e.g., Sorisio v. Lenox, Inc.*, Civil No. B–84–634, —— F.Supp. —— (D.Conn. May 26, 1988), Ruling on Motion for Summary Judgment.

In *Duhan*, a franchise, under § 42–133k(b), was not found. Lease provisions providing for rent based on the amount of gasoline sold, prescribing certain hours of operation, and requiring the lessor's approval of any advertising signs placed on the premises, were held to be insufficient to constitute a marketing plan or system. *Id.*, 38 Conn.Sup. at 498, 452 A.2d 123. The court also considered the lack of control over auditing of books and inspection of premises, lighting, employee uniforms, prices, sales quotas, and management training as relevant. *Id.* at 498–99, 452 A.2d 123.

In *Ross* and *Narumanchi*, citing *Duhan*, the agreements between Shell and its service station dealers were held not to constitute franchises under § 42–133k(b). In *Ross*, the defendant's motion for summary judgment was granted on the basis that, as a matter of law, Shell had not "imposed a marketing plan or system" upon the plaintiff's operation. *Ross*, 672 F.Supp. at 66. The absence in the dealer agreement of sales quotas, minimum purchase requirements, and any obligation to retail Shell products was noted. *Id.* The plaintiff was

also free under the agreement to set the retail price for gasoline and other products sold at the station. Further, the agreement characterized Ross as an "independent businessman" and that Shell had no right "to exercise any control over, or to direct in any respect the conduct or management of the Dealer's business or operations." *Id.* In addition to these factors, in *Narumanchi* the plaintiff "hired his own employees and alone supervised the operations of the station." *Narumanchi*, slip op. at 7.

▮ Plaintiffs here ask the court, in determining whether a "marketing plan" exists, to look not only at the Premises Lease and Lessee Dealer Gasoline Agreement, but also to evidence of Arco's national marketing objectives. *See Grand Light & Supply Co. v. Honeywell*, 771 F.2d 672, 677 (2d Cir.1985) (bringing promotional guidance or materials into the Act's coverage would constitute legislature overkill). Although such evidence may represent Arco's national marketing plan, the real issue is whether that marketing plan has been "imposed" upon plaintiff's operation. *See Ross*, 672 F.Supp. at 66. Plaintiffs have made no showing that they are in any way bound or subject to control pursuant to Arco's national marketing plan.[2] Thus, the court will consider only the Premises Lease and Lessee Dealer Agreement in determining whether a marketing plan has been imposed upon plaintiffs.

▮ As in the agreement at issue in *Ross* and *Narumanchi*, plaintiffs are not subject to any sales quotas nor under any obligation to purchase and retail Arco products. Plaintiffs are free to set retail prices and to hire and supervise employees of the station. Further, the Dealer Gasoline Agreement characterized plaintiffs as an

---

**2.** Plaintiffs also claim the AM/PM Mini Market Agreement and Store Systems Manual evidence a marketing plan imposed on the petroleum operation. This argument fails to realize that any such control is not imposed but only incidental to the fact both operations share the same premises. Any breach of the convenience store agreements would not give defendants any cause of action pursuant to or right to terminate the gasoline agreement. Both agreements, while related, impose independent obligations upon plaintiffs. *See, e.g., Smith v. Atlantic Richfield Co.*, 533 F.Supp. 264 (E.D.Pa.), *aff'd*, 692 F.2d 749 (3d Cir.1982) (AM/PM Convenience Store Agreement not a secondary agreement essential to plaintiff's motor fuel franchise).

"independent contractor" who "shall exercise and be responsible for the exclusive control of the premises and all activities conducted therein."

The terms of the Premises Lease required plaintiffs to maintain a sufficient inventory of petroleum products to satisfy customers, to fully illuminate the premises, and to maintain adequate attendants attired in appropriate uniforms. The lease also gave Arco the right to audit plaintiffs' records, inspect the premises, and set out safety and maintenance rules. Although these provisions show some form of control, they clearly do not usurp the operator's ability to exercise independent judgment on marketing decisions. Thus, no "marketing plan or system" was imposed upon plaintiffs' operation and the agreement is not a "franchise" as defined in the CFCFA. Accordingly, plaintiffs' motion for summary judgment on Count One is denied and defendants' cross-motion for summary judgment is granted.

### B. *Count Three*

In Count Three, plaintiffs argue that Arco breached their AM/PM Mini Market Agreement and violated Connecticut law by terminating plaintiffs' AM/PM franchise based on a decision to withdraw from the relevant petroleum marketing area. The AM/PM agreement provides, in ¶ 6.01(b), that the agreement terminates automatically in the event the premises lease terminates. The AM/PM agreement, ¶ 22.03, also provides that in "the event any provisions of this agreement ... provide for termination other than in accordance with applicable law ... they shall not be effective and Company ... shall comply with applicable law."

Defendants argue that the AM/PM agreement was terminated in accordance with applicable law because that agreement provided for its automatic termination on the termination of the premises lease and that lease was properly terminated under PMPA on grounds of market withdrawal.

Plaintiffs counter, arguing that PMPA applies only to petroleum operations and that the applicable law is CFCFA, §§ 42–133e through 42–133h. They assert that franchisors such as Arco may not contractually enlarge the permissible grounds for termination set forth in CFCFA.

■ CFCFA was enacted to limit a franchisor's right to cancel or fail to renew a covered franchise to instances where there is good cause. *See Carlos v. Philips Business Systems*, 556 F.Supp. 769, 776 (E.D.N.Y.), *aff'd*, 742 F.2d 1432 (2d Cir.1983); *see also Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 474, 427 A.2d 385 (1980) (characterizing the CFCFA as limiting the power to terminate franchise contracts to instances of just cause). Allowing Arco to terminate the AM/Pm agreement solely based on the termination of the premises lease, without examining the grounds for termination of the lease, would permit franchisors to circumvent CFCFA by limiting termination of a franchise to a provision in an underlying lease or other collateral agreement.

Under the CFCFA, in order to protect the franchisee, his right to be terminated only for good cause cannot be waived. "Any waiver of the rights of a franchisee under Sections 42–133f or 42–133g which is contained in any franchise agreement entered into or amended on or after June 12, 1975, shall be void." Conn.Gen.Stat. § 42–133f(f). Thus, termination of the AM/PM agreement must be premised on the good cause standard, applying CFCFA, and not simply the fact that the related lease, under the law pertaining to it, is validly terminated.

■ An arrangement whereby the termination of the premises lease automatically triggered termination of the mini-market agreement was interpreted in *Atlantic Richfield Co. v. Brown*, No. 85–C–5131 (N.D.Ill. Oct. 21, 1985) [available on WESTLAW, 1985 WL 3316]. In determining what was "applicable law" under the AM/PM agreement, that court held that the PMPA preempts application of the Illinois Franchise Act to AM/PM mini-market agreements where Arco had validly terminated the premises lease and motor fuel agreement pursuant to its decision to with-

draw from a geographic market. The court reasoned that the three agreements were so inextricably linked that PMPA governed the mini-market agreement as well. The AM/PM agreement was found to reflect Arco's intent to permit franchisees to sell groceries only as long as the franchisee sells motor fuel.

Nonetheless, PMPA is here found not to preempt state franchise law with respect to termination of the AM/PM agreement on the basis of a petroleum market withdrawal. *Brown* appears to overstate the dependence of the gasoline and convenience store operations. The decision to withdraw from the sale of petroleum products in Connecticut does not necessarily vitiate the continued operation of the AM/PM stores. In fact, a number of AM/PM stores operated without the sale of petroleum products and others were sold to competing petroleum retailers. Brief for Defendant–Appellee (Arco) at 11; *Smith v. Atlantic Richfield Co.*, 692 F.2d 749 (3d Cir.1982). Further, William Walker, an AM/PM Regional Sales Manager for Arco, testified that there was no business reason why an AM/PM store could not exist without a petroleum franchise. *See* Deposition of Walker at 70–72.

The next determination is whether "market withdrawal" is a recognized legal ground to terminate a non-petroleum franchise under Conn.Gen.Stat. § 42–133f(a). "Franchise" is defined in § 42–133e(b) as an agreement granting "the right to engage in the business of ... selling ... goods ... under a marketing plan or system prescribed in substantial part by a franchisor."

Determining the existence of a marketing plan raises the same issues discussed previously under § 42–133k(b), the parallel definitional provision applicable to petroleum franchises. The issue is whether the amount of control exercised over plaintiffs' AM/PM operation rises to the level of a marketing plan or system under § 42–133e(b).

The AM/PM mini-market agreement under ¶ 3.01 incorporates the AM/PM Store Systems Manual which sets forth the "AM/PM standards of professional operation" which all operators must follow. The manual provides accounting standards and auditing procedures, as well as inventory and merchandising criteria that control minimum levels of inventory, the size and placement of any signs or promotional materials, specifications for AM/PM employee uniforms, and the exterior appearance and internal layout of the store under a Design Standards Manual. In addition, the manual provides for initial training in merchandising concepts and convenience store operations.

The introduction to this comprehensive manual stresses the need for operators to become thoroughly acquainted with the required procedures in the manual in order to maintain the merchandising strategy and distinctive quality of service which is a part of the AM/PM system.

The extensive control thus exercised over plaintiffs' marketing and merchandising strategy supports a finding that, as a matter of law, the AM/PM mini-market agreement operated under a marketing plan or system prescribed by Arco. *See Carlos*, 556 F.Supp. at 776–77; *Duhan*, 38 Conn. Sup. at 498–99, 452 A.2d 123; *McKeown Distributors, Inc. v. Gyp–Crete Corp.*, 618 F.Supp. 632, 642–43 (D.Conn.1985). Thus, the AM/PM mini-market operation is a "franchise" under § 42–133e(b).

Section 42–133f(a) sets forth the standards for termination of non-petroleum franchises. That section provides that no franchisor shall terminate a franchise "except for good cause which shall include, but not be limited to, the franchisee's refusal or failure to comply" with the franchise agreement.

Plaintiffs argue that "market withdrawal" does not constitute good cause under the CFCFA. Case law on the issue of good cause has all involved some alleged breach or default under the franchise agreement by the franchisee. *See Carlos*, 556 F.Supp. at 776; *McKeown*, 618 F.Supp. at 643; *Southland Corp. v. Vernon*, 1 Conn.App. 439, 441, 473 A.2d 318 (1984).

**1042**

In this case, the ground for termination was defendants' unilateral decision to withdraw from the marketing of petroleum in Connecticut. This does not constitute "good cause" under § 42–133f(a). Defendants' decision only relates to the AM/PM store insofar as defendants had tied the termination of the petroleum operation and premises lease to the termination of the AM/PM franchise. Defendants have made no showing as to why withdrawal from the marketing of petroleum is cause to terminate a convenience store franchise. Accordingly, plaintiffs' motion for summary judgment on Count Three is granted as to defendants' liability under § 42–133g(a) for a violation of § 42–133f(a). At this time, plaintiffs have made no showing as to any damages sustained by reason of such violation.

SO ORDERED.