**Robert PETEREIT, et al.**

v.

**S.B. THOMAS, INC.**

**Eric Carl AHLQUIST, et al.**

v.

**S.B. THOMAS, INC.**

Civ. Nos. 3:93CV 00865 (PCD), 3:93CV 00957 (PCD).

United States District Court, D. Connecticut.

Oct. 25, 1993.

Robert A. Horowitz, Thomas H. Kukowski, Kelley Drye & Warren, Stamford, CT.

Paul Ruszczyk, Dice, Maloney & Lenz, Cheshire, CT.

Robert M. Decrescenzo, Updike, Kelly & Spellacy, P.C., Hartford, CT.

Richard S. Order, Kevin N. Reynolds, Updike, Kelly & Spellacy, P.C., Hartford, CT.

## MEMORANDUM OF DECISION

DORSEY, District Judge.

The end of the era in which "handshake deal" relationships commence and then evolve from a mutuality of interests, motivation and good faith, is evident in the present dispute. Plaintiffs seek permanent injunctions. The cases were heard at the same time absent material distinguishing factual issues.

*FACTS:*

Plaintiffs distribute defendant's food products out of a Waterbury depot, and out of a Newington depot (until recently when defendant mandated use of its parent corporation's terminal). All have so functioned for long periods of time, some over twenty years. None claims the right to sell their route nor to have paid for it. Some, but not all, plaintiffs received letters from defendant which noted the assignments to be non-permanent and non-exclusive, as independent distributors, not as franchisees. Receipt of product for distribution was contingent on satisfactory performance. D.Ex. 16. Each was assigned specific stores, largely high volume chain food stores. In their respective areas plaintiffs are free to obtain other customers,

usually smaller food outlets. Territories were not defined with precision, but were related to the areas of the stores assigned. Some towns had more than one distributor assigned. Routes crossed or intermeshed.

Though plaintiffs are free to set prices to other customers, they are effectively constrained by defendant's chain prices and the retail price defendant prints on each package. Price breaks below prices to chains are not allowed. At the chains, plaintiffs deliver and place on shelves a variety of defendant's products. Defendant arranges for shelf space with chains' central offices. Plaintiffs can seek to enhance the allocation, a rare case since store managers get their orders from central offices with which defendant deals. Defendant sets prices and maintains accounts for the chains based on plaintiffs' sales records, which must be submitted to defendant. E.g. Ex. 79. The balance on the account is paid directly to defendant. Plaintiffs collect from the smaller customers. Plaintiffs have distributed other food products but now distribute only and all defendant's products, as mandated by defendant. Defendant's supervisors regularly meet and counsel plaintiffs on marketing and customer service and ride with distributors. Defendant holds sales meetings in order to present marketing strategies regarding new products and disclose sales goals. Ex. 27. Attendance is required. Ex. 37.

One plaintiff has sub-distributors service part of his area, one of whom defendant required. Supervisors monitor plaintiffs' ordering, Ex. 49, depot operation (plaintiffs lease and maintain), customer servicing including amount and display of products and compliance with performance standards promulgated by defendant. E.g. Ex 45. The current sales manager contends distributorships are contingent on the purchase of new, specific delivery vans.

Plaintiffs order defendant's products they wish delivered to their respective depots. The supervisors occasionally increase orders unilaterally to stimulate sales. Defendant sets delivery days to the depots. All products are marketed under defendant's name, brand, trade-mark and packaging which also appear in advertising, displays and account sheets. Defendant requires chain stores to be serviced five times per week, specifying the days and delivery by 11 AM as required in turn by the chains. This requirement was part of defendant's marketing plan, intended to insure adequate product on shelves and its proper display and to increase sales, particularly of its new product. Because Thomas credits plaintiffs for unsold product, it has an interest in the timely placement of product to maximize its exposure for retail sale before it is removed for thrift shop sale at a lower return. *See* Defendant's Post-trial brief, p. 20 n. 11. In part, compliance with its concept of better service to stores through this requirement gave rise to the disputed store reallocations. Defendant determines products' shelf life. At each store, expired product is removed, fresh product is placed and the shelf arranged as defendant mandates to maximize sales. Plaintiffs are required to maintain a route book.

Defendant's products are largely impulse buys. It determines an optimum product display for plaintiffs to follow. It devises, arranges and pays for all advertising, merchandising programs which require plaintiffs' implementation and promotions which require their participation and expense. Between deliveries, stores' stock is depleted and disarranged. Plaintiffs must counter such by callbacks (revisiting) to stores. Defendant's supervisors inspect for maintenance of adequate shelf stock and proper display. Callbacks are not specified, but plaintiffs are called to account when stores are found to be deficient in product amount or display. Out of date product is disposed of through thrift stores, charity donation or other means dictated by defendant. Plaintiffs earn commissions on product sold, but not on out-of-date product.

Defendant paid toward and required a uniform, a non-standard set of clothing that sported defendant's trade-mark, but neither enforced nor disclaimed the requirement. A Plaintiff has been reprimanded for his dress. Plaintiffs' trucks can be, but are not universally marked with the brand. Defendant supplies materials used by plaintiffs but no financing. Plaintiffs arrange their own sub-

stitute drivers, though defendant has vetoed some substitutes.

Plaintiffs, supported by independent testimony and assurances of several district sales managers, were led to believe the stores to which they were assigned were assured so long as they serviced them properly. Defendant's claim that this did not preclude its unilateral right to alter store assignments is not credited. An earlier proposed unilateral realignment was not pursued in the face of distributor opposition. Other reallocations were made by agreement. An Independent Contractor Agreement, P. Ex. 24, A. Ex. 7 (ICA) came to be used with distributorships, starting in 1984. No plaintiff was requested to sign such out of concern that they would refuse to do so. Defendant thereby tacitly acknowledged that it could not unilaterally dictate the terms of its arrangements with its distributors. The letter, delivered to some plaintiffs, A. Ex. 6, did not purport to bind plaintiffs. Indeed by not calling upon them to sign an ICA suggests the contrary. No comment was invited. The attempts to bind plaintiffs by reading the letter to them and announcing that its terms would control their distributorships are unavailing to alter preexisting relationships. The provision in the ICA on which defendant relies is not an unambiguous reservation of a unilateral right to alter routes or store assignments, nor is a letter sent to some of plaintiffs. Def.Exs. 3, 4 and 5. The testimony of defendant's witness, Daley, that the right was subject only to a guarantee of plaintiffs' opportunity to make a living, nowhere defined or quantified, is not credited. It was conceded, however, that there was a limit to the right to alter routes, however unclear.

Defendant's occasional complaints have been satisfactorily resolved by defendant's managers with individual plaintiffs, though defendant's demands have been backed by termination threats. Ex. 34. Defendant announced its reallocation of plaintiffs' stores, in all cases reducing the number of stores and sales volume. Defendant claims the loss will be offset by higher sales from more effective service and from a new product. The stores taken from plaintiffs were to be reassigned with new distributorships created.

Nardello's sub-distributorships would become new distributorships.

*RELIEF SOUGHT:*

On the basis that defendant's actions breached their contracts and violated Connecticut's Franchise Act, Conn.Gen.Stat. § 42–133e et seq, which applies to plaintiffs, they seek an injunction prohibiting store realignment, termination of the distributorships, and creation of new distributorships, a declaration that defendant violated the Connecticut Unfair Trade Practices Act ("CUTPA"), and award of costs, attorney fees and punitive damages.

Defendant asserts that there was no breach of contract, that the Franchise act does not apply because the distributorships were not franchises, the distributorships were not terminated and it did not violate the act, that it committed no unfair trade practice, that there was no tortious interference and that specific performance is an inappropriate form of relief.

*CONCLUSIONS:*

Between plaintiffs and defendant there was an understanding, an agreement, a contract. It was not written. It is not set forth in the ICA which obtained neither an explicit nor implicit assent thereto from any plaintiff. The absence of exception or objections by plaintiffs to the ICA is not found to constitute an acceptance or acquiescence to it by plaintiffs. "The contractual relationship must be shown by some intelligible conduct, acts and words and not from an unexpressed intention." *Hess v. Dumouchel Paper Co.,* 154 Conn. 343, 348, 225 A.2d 797 (1966). It is not necessary to determine all the terms of the understanding. Defendant did not retain an absolute right to terminate it nor to alter route/store assignments at will. Defendant knew, actually or as a reasonable understanding, such was the case. Previous store reallocations were subject to discussion, usually with some consideration to the distributor. Defendant's reallocation of the stores serviced by Nardello's sub-distributors would constitute termination of his contract as it would strip him of approaching 75% of his business and not merely alter his routes.

■ The relation of defendant to plaintiffs is not governed by the 1984 ICA nor by disclaimers.[1] Rather its legal significance is fixed by reality, not by what defendant or plaintiffs call it, though descriptive language may be relevant. A cow is a cow, no matter what color it is painted. Significantly, defendant claims that the details in the ICA "embodied the methods and procedures under which Thomas and all distributors were doing and would continue to do business." Defendant's Pretrial Memorandum, P. 14.

■ Defendant argues that much of what is required of its distributors mirrors industry standards or practices, are good business, would be done by plaintiffs anyway or come from the chain store customers. The question is not determined by the origin of particular aspects of a plan but whether plaintiffs' distribution of product is part of a plan which, in substantial part, defendant has prescribed. The fact that the required practices benefit plaintiffs is not determinative of defendant's exercise of control to carry out, in substantial part, a marketing plan.

## DISCUSSION:

### A. CONTRACT

■ Clearly a contract exists between defendant and plaintiffs. Though writings have surfaced, no single document has articulated the understanding of the parties. What is clear is that plaintiffs were established as distributors of defendant's products. They were assigned specific stores. They were obliged, and entitled, to service those stores. They were entitled to seek other customers for defendant's products proximate to the stores assigned. Defendant was obliged to supply its products and pay a commission for plaintiffs' work. There was no reservation to defendant of a unilateral right to reallocate stores from a plaintiff. Plaintiffs were lead to believe that an assigned store would be theirs to service as long as they did so faithfully and in compliance with defendant's reasonable expectations. Each relied on that expectation in undertaking the distributorships and continuing to so function. Defendant's unilateral declared intent to reallocate store assignments was an anticipatory breach of its obligation to continue plaintiffs' distributorships. Its stated intent of doing so violates plaintiff's rights. Defendant is therefor enjoined from unilaterally changing the store assignments of plaintiffs Petereit, SanAngelo and Nardello from those in force at the commencement of this suit and preserved by the preliminary injunction entered herein. The reallocations of the stores which had been assigned to plaintiffs Alquist, Adkins, Desso, Lonergan, Pitrone, Strasser and Anderson, in April, 1993, violated the rights of those plaintiffs. Defendant shall restore to those plaintiffs their store allocations as were in effect in and prior to April 1993.

### B. FRANCHISES

■ The Connecticut Franchise Act was intended to clarify the rights and obligations between franchisors and franchisees because the greater bargaining power of a party in control of a product could result in injustice and losses which could not be recouped. Defendant baked the products and controlled the trade-mark. As individual distributors, plaintiffs have no unique role. Absent enforceable rights, plaintiffs can be replaced without compensation for their equipment and/or their investment of time in establishing a sound, reliable distribution expectancy for the product. While many factors which contribute to the market success of defendant's products have nothing to do with plaintiffs, by their efforts the availability of the products in the market is assured. Though there is nothing unique to their work, in the sense that others could as readily do it, these men have done it over time so that retailers have come to rely on them and consumers have, albeit unknowingly, benefitted by the products' presence in stores when they were wanted. However small in the picture, plaintiff's work is real to them. Thus they fit the profile of those intended to be benefitted by the Franchise Act.

■ The act applies to all agreements entered, renewed or amended after October 1, 1972. Conn.Gen.Stat. § 42–133h. All of plaintiffs' distributorships fluctuated in terms

---

1. Franchise rights are not waivable. Conn.Gen. Stat. § 42–133f.

of the arrangements, as stores were added or other aspects were altered. Each is found to come within the provisions of § 42–133h. Thus the question of whether the enforcement rights apply depends on whether their agreement gives them the right to sell, offer or distribute defendant's products "under a marketing plan or system prescribed in substantial part by" defendant where the business is "substantially associated with [defendant's] trademark, trade name, advertising or other commercial symbol." § 42–133e. Their arrangement is within that criteria. The only serious dispute is whether defendant has prescribed in substantial part a marketing plan or system.

Defendant's products are no different from many others, as its witnesses conceded. For products targeted to a known, existing market the plan stresses product or name identification. Some products require creation of a market. The design of the product or .the recipe for it, its coloring, its packaging, the entire advertising program, and its promotion are part of the plan. All of the foregoing are solely determined by defendant.

■ Products must be delivered to the market created. When the delivery system is closely integrated with the marketing plan, and the two are dictated by a party which exercises substantial control over the entire process, a franchise has been created. *Aurigemma v. Arco Petroleum Products Co.*, 698 F.Supp. 1035, 1041 (D.Conn.1988). With respect to the delivery system, defendant:

a) Designated distributors and stores to be served including all stores of a chain even when unprofitable.

b) Ordered the wearing of uniforms, though not enforced.

c) Enforced standards at the depots and on trucks.

d) Set product prices and shelf life.

e) Fixed promotions and discounts, including distributor participation, arranging same with chain stores directly.

f) Mandated distribution of only and all of defendant's products.

g) Required five deliveries per week to chain stores on days it specified.

h) Set the amount and mix of product for delivery to stores.

i) Determined product shelf arrangement.

j) Inspected stores for adequate shelf stock, product mix, product and proper product display.

k) Arranged with chain stores for shelf space and promotion displays, with which plaintiffs must comply.

l) Decided and arranged ¡product promotions, many of which required distributor accommodation and/or participation.

m) Required and specified accounting and records for chain store accounts, the bulk of plaintiffs' business. Thus it keeps the books and records as to that business.

n) Reserved the right to require a subdistributor be hired and to veto substitute drivers.

o) Supervised distributors by managers riding routes.

p) Promulgated performance standards for distributors.

q) Mandated type and size of delivery truck to insure product delivery which properly serves customers.

r) Dictated distributor's product orders to stimulate sales.

s) Mandated disposition of out-of-date product.

t) Contributed to a uniform cost once and provided materials for distributors' use and displays.

u) Scheduled, arranged and conducted sales meetings.

v) Made distributorships non-transferable.

w) Authorized, but did not mandate, the use of defendant's trade-mark on trucks and uniforms.

■ Defendant stresses that its involvement, seen by plaintiffs as requirements, is simply a matter of common sense in the effective distribution of the product. Therein its interests and those of plaintiffs are common. That view misses the mark

because the need seen for the protection of a franchisee starts with dependence on "the public's confidence in the .... product for most or all of his business." *Sorisio v. Lenox,* 701 F.Supp. 950, 961 (D.Conn.), aff'd, 863 F.2d 195 (2d Cir.1988). It follows that the exclusion of others from designated stores and of distribution of others' products creates exactly that dependence. That fact, coupled with the extensive control exercised by defendant, establishes the three elements of a franchise: distribution of defendant's products, a marketing plan or system substantially prescribed by defendant, and an association of the products with defendant's trademark, name and advertising. All of the foregoing have been deemed relevant to the issue of sufficient control to constitute a franchise. *Grand Light & Supply Co., Inc. v. Honeywell, Inc.,* 771 F.2d 672, 678 (2d Cir. 1985); *Aurigemma v. Arco Petroleum Products Co.,* 698 F.Supp. at 1039–41; *Ross v. Shell Oil Co.,* 672 F.Supp. 63, 66 (D.Conn. 1987); *Narumanchi v. Shell Oil Co.,* Civil No. N–83–544 (D.Conn., Nov. 24, 1986) (Findings of Fact and Conclusions of Law); *Carlos v. Philips Business Systems,* 556 F.Supp. 769, 776–77 (E.D.N.Y.), *aff'd* 742 F.2d 1432 (2d Cir.1983); *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn. Supp. 495, 452 A.2d 123 (1988).

Plaintiffs have been left to decide the order in which to deliver to the stores assigned, whether or not to paint the trademark on their truck, whether or not to wear the uniform, what brand fuel to buy, the purchase and servicing of their trucks, when to call back at particular stores, from whom to obtain any necessary financing and insurance for their vehicles, where and under what terms to lease a depot (as long as defendant does not require use of its terminal), whether to try to designate a successor from which they might extract some consideration, from whom, other than assigned chain stores within their territory they should solicit additional business and what time they wish to start deliveries. These do not bear substantially on, nor contribute materially to, the sale of the product. Plaintiffs exercise no significant independent judgment in marketing the products.

The decision making of defendant in shaping the functioning of the distributors is of such magnitude, breadth, significance and nature as to require a finding that defendant has a marketing plan and system for the sale and distribution of its products which embraces the work of plaintiffs and which is prescribed in substantial part by defendant. Accordingly it is found that plaintiffs are franchisees, holders of a franchise from defendant.

The Waterbury plaintiffs have not been affected by an executed reallocation. Thus defendant must deal with them in compliance with the Franchise Act and their agreement. Defendant makes no claim it has complied with the notice requirements of the Act for a cancellation or termination. Conn.Gen.Stat. § 42–133f(a).

For the Newington plaintiffs, two questions must be discussed. Does their store/route reallocation constitute a termination or cancellation? If so, what relief are they owed, both under the Franchise Act and as a matter of contract right?

In dealing with both groups of plaintiffs, the reallocations constitute a breach of their agreements. It must be decided whether they also constitute a termination or cancellation under the Act. Total abrogation of the agreement is not required for a termination under the Act. *Carlos,* 556 F.Supp. at 776. Before the proposed reallocations plaintiffs had the exclusive right. to distribute defendant's products to specified stores and within a territory. The unilateral right to reallocate asserted by defendant voids plaintiffs' rights as to the stores lost. A loss of revenue would surely result. The claim that lost revenue would be more than offset by additional revenue from the new sandwich size muffins is without merit. Such revenue is speculative. Plaintiffs' exclusive distributorships of all defendant's products would extend also to the new product and the revenue to be derived from sales thereof. It is true that plaintiffs would have added revenue from a product they have not had before. However, that is revenue to which they were entitled from a product they had exclusive rights to distribute. Thus it gives plaintiffs nothing to which they were not already enti-

tled. By taking away revenue from previously served stores, a substantial breach has occurred both of contract and franchise sufficient to constitute a termination. This is true as to all plaintiffs.

 Having found a termination, defendant's claim of a termination for cause must be decided. The justification for the reallocation is that it was good for business. The unilateral right to decide what is good for business, and therefor mutually beneficial, is the kind of paternal approach that neither the law of contracts nor the Franchise Act condones. To permit defendant to find cause in purportedly sound business judgment is to make the relationships illusory. The contracts here reserved no such right to defendant. The Franchise Act refers to the necessity "for good cause" and then proceeds to illustrate that phrase by referring to conduct of the franchisee. Thus clearly good cause is to be found in the failure or non-performance by the franchisee. Nothing akin to such is the case here, and there was no good cause.

Plaintiffs are entitled to enjoinder of defendant's claimed right to unilateral reallocation of routes and assigned stores, both prospectively and after the fact. The Waterbury plaintiffs are therefor entitled to an injunction precluding the unilateral reallocation. The Newington plaintiffs are entitled to an order that defendant restore their routes/store assignments to those in effect prior to April, 1993 and barring any unilateral reallocation of stores so long as the parties' present agreement is in force.

## C. CUTPA

 The findings and conclusions herein do not warrant relief under the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et seq.* ("CUTPA"). While defendant's acts complained of herein violated public policy as articulated in the Franchise Act, and could have caused substantial injury, *see Web Press v. New London Motors,* 203 Conn. 342, 355, 525 A.2d 57 (1987) and *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984), they are not found to have been of the immoral, unethical, oppressive or un-

scrupulous nature and degree required for a breach of CUTPA. *See Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc.,* 190 Conn. 528, 539, n. 13, 461 A.2d 1369 (1983). Punitive damages are not due either.

## D. COSTS AND ATTORNEY FEES

 Plaintiffs are entitled to an award of costs and attorneys fees. Conn.Gen.Stat. § 42–110g(d); *Chrysler Corp. v. Maiocco,* 209 Conn. 579, 552 A.2d 1207 (1989). Plaintiffs may submit their claim within ten (10) days hereof with the documentation to be available to defendant for objecting within fourteen (14) days thereafter. If, as thus presented, a hearing is required, a date will then be set.

## CONCLUSION:

Defendant breached its contracts, actually as to the Newington plaintiffs, anticipatorily as to the Waterbury plaintiffs. Plaintiffs are franchisees whose franchises would be, or have been, terminated by the reallocations. No CUTPA nor contractual interference claims have been proven. Defendant is ordered to refrain from reallocating the Waterbury plaintiffs' stores (3:93cv00865) and to restore, and then refrain from reallocating, the Newington plaintiffs' stores (3:93cv00957). Costs and attorney fees will be awarded if and when the amount of their entitlement is shown.

SO ORDERED.