63 F.3d 1169
 Robert PETEREIT; Robert J. Nardello; Richard SanAngelo,
Plaintiffs-Appellees,
v.
S.B. THOMAS, INC., Defendant-Appellant.
Eric Carl AHLQUIST; David Lee Adkins; Richard Earl Desso;
James Michael Lonergan; Anthony Frank Pitrone;
John Alan Strasser; Wayne Blair
Anderson, Plaintiffs-Appellees,
v.
S.B. THOMAS, INC., Defendant-Appellant.
 Nos. 192, 193.
Dockets 93-9293, 93-9299.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1994.
Decided Aug. 18, 1995.
 
 Robert A. Horowitz, Stamford, CT (Christopher M. Graham, Kelley Drye & Warren, of counsel), for defendant-appellant S.B. Thomas, Inc.
 Paul Ruszczyk, Cheshire, CT (Dice, Maloney & Lenz, P.C., of counsel), for plaintiffs-appellees Robert Petereit, et al.
 Richard S. Order, Hartford, CT (Kevin N. Reynolds, Updike, Kelly & Spellacy, P.C., of counsel), for plaintiffs-appellees Eric Ahlquist, et al.
 Before: NEWMAN, Chief Judge, KEARSE, and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This litigation is between a manufacturer and a number of its distributors in the State of Connecticut. The distributors are of course somewhat at the mercy of the manufacturer whose products they distribute. For that reason they might believe they stand in the shoes of a David challenging a Goliath. Yet, casting the instant suit in terms of the biblical story, the small entrepreneur against all odds taking on the large corporation, does not accurately reflect the reality of the relationship between the parties. The State of Connecticut has enacted a statute the aim of which is to balance the disparity in economic power between a manufacturer and its distributors. We must decide whether either the parties' contracts or the Connecticut statute affords the distributors the protection they seek from the manufacturer's economic decision-making.
 
 
 2
 Defendant S.B. Thomas, Inc. (Thomas) appeals from a judgment of the United States District Court for the District of Connecticut (Dorsey, J.) entered November 3, 1993 after an eight-day bench trial. Thomas' decision to implement a plan to increase customer service frequency, which it has determined results in higher sales, generated this dispute between it and ten of its Connecticut distributors. The plan involved rationalizing the hodge-podge of overlapping distributor territories that had developed over the years. The district court found that Thomas' attempt to realign the distributors' territories breached oral agreements it had with the distributors providing for permanent territories. In addition, the district court held that the realignment constructively terminated plaintiffs' franchises without good cause in violation of the Connecticut Franchise Act, Conn.Gen.Stat. Sec. 42-133e et seq. It therefore issued a permanent injunction prohibiting Thomas from unilaterally altering the distributors' territories. See Petereit v. S.B. Thomas, Inc., 853 F.Supp. 55 (D.Conn.1993). For the reasons discussed below, we affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 3
 We set forth the facts that form the background of this litigation. Defendant Thomas manufactures baked bread products, including the well-known Thomas' English Muffins. Plaintiffs Robert Petereit, Robert J. Nardello and Richard SanAngelo (the Petereit plaintiffs) distribute Thomas products in Waterbury, Connecticut, and the surrounding area. Plaintiffs Eric C. Ahlquist, David L. Adkins, Richard E. Desso, James M. Lonergan, Anthony F. Pitrone, John A. Strasser and Wayne B. Anderson (the Ahlquist plaintiffs) perform the same function in the Hartford, Connecticut area. All have been distributors for long periods--ranging from 10 to 30 years.
 
 
 4
 As a young company expanding in the Connecticut market, Thomas initially contacted Pepperidge Farms distributors asking them to distribute Thomas' goods as well. In the mid-1970s, as sales of both companies grew, the Thomas and Pepperidge Farms routes were split apart. The "splitting" of routes continued at least until 1989 or 1990, when Petereit gave up his Pepperidge Farms route. Due in part to the distributors' right to sell their Pepperidge Farms routes, but not their Thomas routes, many decided to continue as Thomas distributors. Thomas distributors now distribute only that company's products.
 
 
 5
 A prospective distributor usually began its business relationship with Thomas by a meeting with a district or regional sales manager. At such a meeting the Thomas representative would lay out the terms of the proposed business relationship. In these early informal years, the distributor would begin delivering product within days of the meeting; in some cases, he might have already started distributing Thomas products in the days immediately before the meeting. It was defendant's business practice to have the sales manager send a letter to the distributor shortly after the meeting or the commencement of the distributorship to confirm the terms previously agreed upon. Thomas was able to introduce at trial such letters addressed to some, but not all, of the plaintiffs. Although brief, the letters comprehensively reviewed the important aspects of the manufacturer-distributor relationship. They specifically noted that the distributor's territory was not permanently assigned, and that distributor status depended upon satisfactory performance. The letters requested the distributor to call the Thomas representative if there were any questions or the letter was not clear.
 
 
 6
 As plaintiffs became Thomas distributors each was assigned specific accounts--generally large, high-volume chain food stores. In addition, plaintiffs were entitled to solicit other customers, usually smaller "Mom and Pop" grocery stores located in their area of operation. As a result of these imprecise territorial boundaries, some communities had multiple Thomas distributors and distributors' sales routes crisscrossed.
 
 
 7
 Chain food stores, which represent a significant portion of Thomas' sales, bargain with Thomas directly over arrangements such as price and the amount of shelf space afforded its products. These stores are billed by Thomas--based on sales records submitted by distributors--and pay Thomas directly. Smaller stores deal only with the distributors. Distributors are barred from selling Thomas' products to these accounts for less than the price paid by chain stores or for more than the retail price printed on the product.
 
 
 8
 Defendant's sales representatives regularly accompany distributors on their sales rounds to give them advice on marketing and customer service, to help present new products, and set sales goals. Thomas' representatives also visit customers on their own to verify that fresh Thomas products are delivered and displayed properly. All of the products are marketed under the Thomas name, brand, trademark, and packaging. Defendant devises all advertising, merchandising programs and promotions, which require distributors' implementation, participation and expense.
 
 
 9
 When a distributor's territory is small, both Thomas and the distributor have an interest in its growth. But this coincidence of interests diverges as a distributor grows larger. Growth benefits both, but each has a different approach as to how best to achieve it. Thomas believes increased frequency of service results in increased sales. Thus, it focuses on having its distributors call on each customer more often. The best way to increase customer calls, it postulates, is to lessen the distance each distributor must travel, either by shifting stores among distributors or by creating new routes from stores originally serviced by other distributors; that is, distributors' territories should be made geographically more compact. The distributors agree that increased service helps sales, but they think the best way to increase sales is to enlarge their territory. They prefer more store locations added to their territories and are unhappy at the prospect of losing larger, more distant customers for smaller, closer ones in the name of efficiency.
 
 
 10
 It is Thomas' realignment of routes that is the subject of the litigation before us. In early 1993 the manufacturer set out to restructure many of the districts in its Northeast Region. It determined that sales in the Waterbury area could be augmented by realigning routes among the Petereit plaintiffs; in the Hartford area the plan called for realigning routes and creating two new routes from the stores serviced by the Ahlquist plaintiffs. Thomas attempted to minimize any negative impact of this realignment by simultaneously rolling out its new Sandwich Size English Muffins, for which it projected heavy sales.
 
 
 11
 Defendant announced the realignment at a sales meeting on April 14, 1993, to be effective April 26, 1993. The Petereit plaintiffs' territories were realigned as follows: three sub-distributorships, operated under Nardello (for which he received a 4 percent commission as opposed to the 19 percent commission on territory for which he served as a distributor), were to be elevated to full distributorships and operated by the current sub-distributors; Nardello would gain four stores from Petereit, including two major chain supermarkets, and Petereit would gain four independent markets; SanAngelo would lose one store to another distributor, not a party to the litigation. The Ahlquist plaintiffs experienced a similar shifting of territories, and two new routes were carved out from accounts several of them serviced.
 
 
 12
 A few days before the effective date of the realignment, the Petereit plaintiffs brought the instant suit to enjoin defendant from implementing the changes. The parties agreed to stay the realignment pending the outcome of this litigation. On April 27, 1993 the Ahlquist plaintiffs sued in Connecticut Superior Court to enjoin the realignment, which had become effective the day before, and for damages resulting from it. Thomas removed the case to the district court. At the bench trial held in July, 1993, both cases against Thomas were heard together.
 
 
 13
 In a memorandum decision, dated October 22, 1993, the district court ruled in plaintiffs' favor. It found that Thomas and each plaintiff had an oral agreement that established permanent territories and that the realignment breached these agreements. Defendant was ordered to restore the pre-realignment routes of the Ahlquist plaintiffs and enjoined from unilaterally altering the routes of the Ahlquist and the Petereit plaintiffs. See 853 F.Supp. at 60, 63. The trial court further determined that the Connecticut Franchise Act (Act), Conn.Gen.Stat. Sec. 42-133e et seq., applied to all the plaintiffs, that each qualified as a franchisee under the Act, that the realignment of each plaintiff's territory constructively terminated its franchise under the Act, and that defendant had not shown "good cause" for termination under the Act. See id. at 61-63. Finding the Franchise Act was violated provided the district court with a second ground for issuing the injunction prohibiting Thomas from unilaterally reallocating plaintiffs' territories and ordering the restoration of the Ahlquist plaintiffs' original routes. Plaintiffs were also awarded costs and attorney's fees. From this judgment, Thomas appeals.
 
 DISCUSSION
 
 14
 Defendant admits its contracts with the plaintiffs provided each would be a permanent distributor, absent cause for termination, but it insists it reserved the unilateral right to adjust and realign specific territories. It further contends that the plaintiffs do not have franchises as defined by the Connecticut Franchise Act; that if the distributorships were franchises under Connecticut law, its realignment of territories did not constitute constructive termination of any franchise; and that if any distributors are deemed to be terminated franchisees, it had good cause for such action. Finally, defendant contends that plaintiffs had an adequate remedy at law, foreclosing the issuance of a permanent injunction.
 
 I Appellate Jurisdiction
 
 15
 A threshold matter--one not raised by either party--is whether we have jurisdiction. An inquiry respecting this issue is one we always have the power to undertake, and where jurisdiction is questionable we are obliged to examine it sua sponte. See Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908); Perales v. Sullivan, 948 F.2d 1348, 1353 (2d Cir.1991). An appellate court's jurisdiction is defined by statute, limited generally to appeals from final judgments of the district courts pursuant to 28 U.S.C. Sec. 1291 (1988), and from certain interlocutory orders pursuant to 28 U.S.C. Sec. 1292 (1988 & Supp. IV 1992).
 
 
 16
 In this case Thomas purports to invoke our jurisdiction to review a final judgment of the district court. A judgment is considered final when the trial court has conclusively adjudicated all the issues before it and there remains nothing left for it to do but execute the order. See Fiataruolo v. United States, 8 F.3d 930, 937 (2d Cir.1993); Morgan v. United States, 968 F.2d 200, 203 (2d Cir.1992). The Petereit plaintiffs' litigation is complete and the district court's decision in that case is final and therefore appealable.
 
 
 17
 The Ahlquist plaintiffs, on the other hand, sought both a permanent injunction and monetary damages. The trial court bifurcated these two issues and the determination of damages has yet to be made. A judgment fixing liability without a calculation of damages--unless their computation is merely ministerial in nature--is not an appealable final order. See In re Fugazy Express, Inc., 982 F.2d 769, 775 (2d Cir.1992); Arp Films, Inc. v. Marvel Entertainment Group, Inc., 905 F.2d 687, 689 (2d Cir.1990) (per curiam). However, where a district court grants permanent injunctive relief but reserves decision on damages, we have jurisdiction to hear the appeal pursuant to Sec. 1292(a)(1). See, e.g., Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 739 (2d Cir.1994). Therefore, the grant of a permanent injunction against Thomas in the Ahlquist litigation is an appealable interlocutory order. Having satisfied ourselves that we have jurisdiction, we pass now to a discussion of the merits.
 
 II The Distributors' Agreements
 
 18
 The trial court found that defendant entered into an oral agreement with each plaintiff providing for the permanent assignment of stores, subject to proper service by the distributors, and that Thomas was therefore not entitled unilaterally to alter plaintiffs' routes. Further, the district court determined, the confirmation letters defendant sent to some distributors at the commencement of their distributorships did not reserve to Thomas the unilateral right to alter routes. See 853 F.Supp. at 59-60. Thus, the district court concluded, the realignment was a breach of the oral agreements between Thomas and the Ahlquist plaintiffs and an anticipatory breach of the oral agreements between Thomas and the Petereit plaintiffs. Thomas maintains the confirmation letters clearly state that territories were not permanently assigned.
 
 
 19
 The factual findings of the district court--whether based on oral or documentary evidence--are of course subject to the clearly erroneous standard of review. See Fed.R.Civ.P. 52(a); see also Anderson v. City of Bessemer, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). A factual finding is not clearly erroneous unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The legal conclusions to be drawn from factual findings, including the conclusion that the contract has been breached, are subject to de novo review. See Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir.1994).
 
 A. Letters Confirming Distributorships
 
 20
 We agree with defendant that the letters have legal significance and need to be examined more closely. Some, if not all, plaintiffs began their business relationship with defendant at a meeting with a Thomas representative. At a typical meeting the Thomas representative explained the terms of the distributorship, in effect making an offer to the distributor to enter into a contractual relationship. If the distributor accepted, nothing else needed to be done to have an enforceable contract. Since Thomas' agreements with distributors were contracts of indefinite duration, they were excluded from the statute of frauds, Conn.Gen.Stat. Sec. 52-550(a), and no writing was required to evidence them. See, e.g., C.R. Klewin, Inc. v. Flagship Properties, Inc., 220 Conn. 569, 600 A.2d 772, 779 (1991).
 
 
 21
 But defendant chose not to end the contract-making process at that stage. Thomas understood the value--both legal and practical--of reducing its oral agreements to writing. As to plaintiffs Nardello, Petereit, Pitrone, Lonergan, Strasser and Adkins, appellant's regional or district sales manager sent them each a letter confirming the terms of the agreement that had been reached. These letters were sent within days of the meeting or within days of the effective date of the distributorship.[1]
 
 
 22
 The confirmation letters are basically similar. They are each two to three pages in length and, with two exceptions, each states that its purpose is to confirm the conversation between the Thomas representative and the distributor. The exceptions--the letters to Adkins and Lonergan--were each mailed four days after the effective date of the distributorship and therefore implicitly meant to confirm the earlier conversations. Each letter refers to the distributor's territory in geographic terms and the effective date of the distributorship. The second paragraph of each states, in almost identical terms
 
 
 23
 It is understood that we do not assign territory on a permanent basis, and our decision to continue to ship products for your distribution is contingent upon our satisfaction with this arrangement in the future.
 
 
 24
 The letters go on to detail discussions of sales commissions, returns of stale product, retail prices, and ordering requirements. Almost all set forth the manufacturer's requirement that its products be displayed only on the fresh bread counters, never in frozen food cabinets. Each missive ends with the Thomas representative asking the distributor to call him if there is anything that is not fully understood or if there are any questions. No plaintiffs called.
 
 B. Legal Significance of the Letters
 
 25
 The district court credited testimony that the oral agreements provided for unalterable territories. Thomas insists the testimony established only that distributor status was guaranteed, absent cause for termination, but that no specific stores or territories were assigned to a distributor on a permanent, unalterable basis. Defendant avers that its view of the testimony is supported by the plain language of the letters, and that the contrary finding of the district court was clearly erroneous because it was contradicted by the letters' plain language. It asserts that it is improper to rely on testimony about oral agreements that contradicts the terms of written contracts because such reliance violates the parol evidence rule.
 
 
 26
 The district court treated the confirmation letters merely as evidence of the content of the oral agreements between Thomas and plaintiffs, rather than as written contracts. In doing so it noted that "no single document has articulated the understanding of the parties." 853 F.Supp. at 60. What the district court failed to recognize was that even if the letters were only partial articulations of the parties' agreements, the parol evidence rule would still operate to exclude oral testimony of contract terms inconsistent with those contained in the writings.
 
 
 27
 It is a cornerstone of contract law that written agreements hold a special place in the eyes of the law. Under the parol evidence rule, " 'if a written contract is found to be the final repository of agreements made between the parties, evidence of a prior unwritten agreement would not be allowed to have any effect on the agreement as integrated in the writing.' " Damora v. Christ-Janer, 184 Conn. 109, 441 A.2d 61, 64 (1981) (quoting Shelton Yacht & Cabana Club, Inc. v. Suto, 150 Conn. 251, 188 A.2d 493, 496 (1963)). This is a rule of substantive contract law, not a rule of evidence. See TIE Communications, Inc. v. Kopp, 218 Conn. 281, 589 A.2d 329, 332 (1991) (citing 2 Restatement (Second), Contracts Sec. 213, comment (a)); see also Vezina v. Nautilus Pools, Inc., 27 Conn.App. 810, 610 A.2d 1312, 1314 (1992).
 
 
 28
 The parol evidence rule "is premised upon the idea that 'when the parties have deliberately put their engagements into writing ... it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to ... contradict what is written, would be dangerous and unjust in the extreme.' " TIE Communications, Inc., 589 A.2d at 333 (quoting Glendale Woolen Co. v. The Protection Ins. Co., 21 Conn. 19, 37 (1851)) (alteration in original). The logical outcome of the rule is that when there is an oral agreement that one party reduces to a writing, the other party's assent to the writing, by words or conduct, even though a term of the writing differs from the oral understanding, is an acceptance of the substituted term, and the writing is the final embodiment of the agreement. See 2 Restatement (Second), Contracts Sec. 209 cmt. b, illus. 2 (1981).
 
 
 29
 Preliminary to the application of the parol evidence rule is the inquiry as to whether there is an integrated agreement. See Suburban Sanitation Serv. v. Millstein, 19 Conn.App. 283, 562 A.2d 551, 553 (1989) (quoting 2 Restatement (Second), Contracts Secs. 209(a), 210(3)). "A written agreement is 'integrated' and operates to exclude evidences of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing...." Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 557 A.2d 525, 528 (1989) (citing 2 Restatement (Second), Contracts Sec. 215) (internal quotations omitted). Moreover, it is the intent of the parties that determines whether the written contract was the final repository of the oral agreements and, if so, the oral agreement is not considered when determining the obligations of the parties. See id. 557 A.2d at 528 (quoting Damora, 441 A.2d at 64-65); see also Giorgio v. Nukem, Inc., 31 Conn.App. 169, 624 A.2d 896, 899 (1993).
 
 
 30
 Whether the parties intended a writing to be an integration of their oral agreement presents a question of fact. See Associated Catalog Merchandisers, Inc., 557 A.2d at 529; Giorgio, 624 A.2d at 899. As noted above, the district court treated the confirmation letters as evidence of the terms of the oral agreements, rather than as contracts in their own right. Hence, the district court made no findings as to whether Thomas and the distributors intended the confirmation letters to be integrated agreements. Normally, at this juncture we would remand this issue to the district court for it to make such a finding. But the record before us leaves us with the firm conviction that a reasonable trier of fact could come to but one conclusion. We view the evidence as establishing, as a matter of law, that the confirmation letters were assented to as integrated writings of the Thomas-distributor relationship. Our reasons follow.
 
 
 31
 It is clear that defendant's normal policy was to have its representatives send confirmation letters to new distributors. These relatively identical letters span a nearly 20-year period from 1966 to 1984, at which time defendant began its practice of having new distributors execute Independent Contractor Agreements. The language of the letters, "confirming" the meeting, discussing in detail the important aspects of the Thomas-distributor relationship, and asking the recipient to make inquiry if any questions remained, expresses Thomas' intention that the writing be an integrated agreement.
 
 
 32
 To the extent the writing differed from any oral understanding of the parties, it was a substitution of new terms. Because the new terms and the writing are one and the same, the acceptance of these new terms is the assent to the letter as an integration of the parties' understanding. Such acceptance can be shown by acts or conduct or by the offeree's silence and inaction. See John J. Brennan Constr. Corp. v. City of Shelton, 187 Conn. 695, 448 A.2d 180, 187-88 (1982); Pleines v. Franklin Constr. Co., 30 Conn.App. 612, 621 A.2d 759, 762 (1993). "It is axiomatic that, regardless of a party's actual intent, if he conducts himself so as to lead the other party reasonably to conclude that he is accepting an offer to contract, acceptance has taken place as a matter of law." John J. Brennan Constr. Corp., 448 A.2d at 187; see also Pleines, 621 A.2d at 762.
 
 
 33
 Plaintiffs did not question the terms set forth in the confirmation letters. This acquiescence, coupled with performance under the contract for a period ranging from nine years (in the case of Adkins) to 27 years (in the case of Nardello), entitled defendant justifiably to conclude that the letters' terms had been accepted. As a matter of law, plaintiffs accepted the terms of the confirmatory letters and assented to the writings as integrated agreements with Thomas. Were we to hold otherwise, the recipient of a writing confirming the terms of a contemporaneous oral agreement could escape an unfavorable written provision that the recipient believes differs from the oral understanding simply by silence. The recipient could perform under the agreement and years later renounce the written terms of the contract to the surprise of the offeror. Such a rule would nullify the benefits of reducing an agreement to written form, and is one we decline to make.
 
 C. Resolution of Contract Questions
 
 34
 Having found that written contracts existed between Thomas and Nardello, Petereit, Pitrone, Lonergan, Strasser and Adkins, we must determine what the contract said with respect to the permanence of distributors' territories. "Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." Levine v. Massey, 232 Conn. 272, 654 A.2d 737, 740 (1995) (quoting Mulligan v. Rioux, 229 Conn. 716, 643 A.2d 1226, 1239 (1994)) (alteration in original).
 
 
 35
 In interpreting these contracts, we must glean the parties' intentions as expressed in the language they used, and not whatever unexpressed views may have existed in their minds. See Barnard v. Barnard, 214 Conn. 99, 570 A.2d 690, 696 (1990); Powel v. Burke, 178 Conn. 384, 423 A.2d 97, 99 (1979). Further, courts do not stretch words to create an ambiguity when their ordinary meaning leaves no room for such doubt. See Zullo v. Smith, 179 Conn. 596, 427 A.2d 409, 412 (1980). The confirmation letters state, in relevant part, that "[i]t is understood that we [i.e., Thomas] do not assign territory on a permanent basis, and our decision to continue to ship products for your distribution is contingent upon our satisfaction with this arrangement in the future." The plain meaning of this sentence is that a distributor's territory is not permanent, but rather is subject to alteration, and that whether one continues as a distributor of Thomas' goods is conditional on appellant's satisfaction.
 
 
 36
 While Thomas may not terminate a distributor without good cause, no similar requirement is imposed with respect to altering territory. The confirmation letters reserve to defendant the right to realign distributors' routes, and doing so does not breach its written agreements with plaintiffs Nardello, Petereit, Pitrone, Lonergan, Strasser and Adkins. Consequently, we conclude that the district court erred in failing to recognize that the written agreements were determinative of the contractual relationship between Thomas and these plaintiffs.
 
 
 37
 Plaintiffs Ahlquist, Anderson, Desso and SanAngelo stand on a different footing. There were no confirmation letters pertaining to them introduced into evidence at trial. Thus, we are left with the district court's view of the testimony as establishing that the oral agreements defendant entered into with these plaintiffs provided for unalterable territories. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511; see also Travellers Int'l, A.G., 41 F.3d at 1574-75. The district court's determination that plaintiffs entered into oral contracts for permanent territories is not clearly erroneous, and we affirm that finding with respect to those plaintiffs for whom written agreements to the contrary were not in evidence.
 
 
 38
 Defendant asserts that, if oral contracts for permanent territories exist with those plaintiffs, it could end those contracts because of those plaintiffs' inadequate service frequency. A fortiori, Thomas continues, it could take the lesser action of realigning their territories. Although this argument might have merit where it is shown that a particular distributor had been performing inadequately, such is not the present case. Here the inadequate service frequency defendant complains of does not rise to the level of a breach of contract. Thomas' proof at most demonstrated its perceived business need to increase service frequency throughout plaintiffs' territories. Even if plaintiffs' frequency of performance fell below the goals Thomas was seeking to establish, there was no proof that their performance was so inadequate as to amount to a breach of their oral agreements. Hence, we affirm the district court's finding that Thomas breached its contracts with plaintiffs Ahlquist, Anderson, Desso and SanAngelo.
 
 III The Connecticut Franchise Act
 
 39
 Before discussing the appropriate remedy for breach of contract, we turn to an examination of the district court's second basis for issuing an injunction, that is, Thomas' violation of the Connecticut Franchise Act. The district court believed the distributors hold franchises under the Act, and that the realignment constructively terminated them without good cause. Thomas challenges each part of this holding, contending that (A) the distributors are not protected by the Franchise Act, (B) even if they are, the realignment worked no constructive termination of those franchises and, (C) in any event, any termination was for "good cause" as permitted under the terms of the Act. We analyze each of defendant's assertions.
 
 
 40
 A. Are the Distributorships Franchises Under the Act?
 
 
 41
 The Act applies to all agreements entered into, renewed or amended on or after October 1, 1972, see Conn.Gen.Stat. Sec. 42-133h, and Thomas does not challenge the district court's finding that all of plaintiffs' distributorships were entered into, renewed, or amended after that date.
 
 
 42
 The first question we must resolve is whether the relationships between Thomas and its distributors constituted franchises within the meaning of the Act. Section 42-133e(b) defines a "franchise" as
 
 
 43
 an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor ...; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber....
 
 
 44
 Conn.Gen.Stat. Sec. 42-133e(b). Thomas concedes that the distributors' businesses are substantially associated with its trademark, but it contends that the first prong of the test--whether plaintiffs operate "under a marketing plan or system prescribed in substantial part" by Thomas--is not satisfied.
 
 
 45
 In deciding this first question we are mindful of the Act's remedial purpose, that is, preventing a franchisor from unfairly exerting its economic leverage to take advantage of a franchisee. See Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672, 677 (2d Cir.1985). We also look to whatever guidance Connecticut's courts may give us on this issue, although admittedly it is sparse. Connecticut's highest court has addressed the Act's definition of a franchise only once, finding in that instance that no franchise existed because the lessor did not own a trademark. See Muha v. United Oil Co., 180 Conn. 720, 433 A.2d 1009, 1011-12 (1980).
 
 
 46
 Whether a purported franchisee operated under a marketing plan substantially prescribed by an alleged franchisor is a subject discussed only in the case of Consumers Petroleum of Connecticut, Inc. v. Duhan, 38 Conn.Super. 495, 452 A.2d 123 (1982). There the Connecticut court held that no franchise existed even though the lessor of a gasoline distributorship received rent based on the number of gallons of gasoline sold, controlled the hours and days of operation, limited placement of advertising signs, and loaned certain equipment to the lessee. See id. 452 A.2d at 125. Duhan enumerated other indicia of control that it thought would suggest the presence of a franchise: the franchisor's auditing of a franchisee's books, inspection of its premises, control of lighting, requiring employee uniforms, setting prices, hiring of a franchisee's employees, establishing sales quotas, and provision of management training and financial support. There is no precise formula as to how many of these factors must be present to find the level of control indicative of a franchise. See Sorisio v. Lenox, Inc., 701 F.Supp. 950, 960 (D.Conn.), aff'd, 863 F.2d 195 (2d Cir.1988) (per curiam). Not all of the Duhan factors are equally weighty or relevant in every case. They should be considered, along with other indicia of control, according to their significance to the business relationship under review.
 
 
 47
 The district court made 23 detailed findings with respect to the amount of control Thomas exerted, under its marketing plan, over plaintiffs.[2] These resulted in its conclusion that plaintiffs are franchisees of Thomas. See 853 F.Supp. at 62.
 
 
 48
 Thomas' principal response to this ruling is that where requirements on distributors are actually imposed by the customers--and are simply passed through Thomas or reflect common-sense business practice--and so would be done by the distributors anyway, the marketing plan is not one imposed by Thomas. We think it irrelevant whether these requirements are or are not imposed on Thomas by others. While the requirements may stem from customers' demands, Thomas chooses to meet them and then imposes the requirements on its distributors. The same may be said of those practices which are dictated by business necessity, but which Thomas chooses to impose as specific performance requirements. Again, many of the factors proving control are imposed solely by Thomas. The decision, for example, of how and when to dispose of stale product, or when to have promotions, or how the product is shelved--it cannot be shelved among frozen foods--did not originate with customers. These controls are in place because Thomas decided they should be.
 
 
 49
 Many of the Duhan control factors are found in the instant case. Thomas kept the books and records for its chain store customers, exerting even more control than that resulting from merely auditing a franchisee's books. In addition, appellant inspected stores to monitor plaintiffs' performance. Moreover, Thomas set the prices for chain store customers, which represent a substantial part of Thomas' sales. Plaintiffs had some discretion as to prices with respect to individual customers, but it was limited by the price given to chain stores and by the retail price printed on the packaging.
 
 
 50
 Price is perhaps the most fundamental aspect of a marketing plan. Where the prices of products are controlled by the manufacturer, and not the distributor, such control effectively deprives distributors of independent judgment in conducting their business. Thus, the ability to set prices is quite indicative of a franchisor's control. While fixing prices alone may not be determinative on this issue, district courts have often addressed that factor when determining the level of control exercised by an alleged franchisor. See Chem-Tek, Inc. v. General Motors Corp., 816 F.Supp. 123, 129 (D.Conn.1993) (plaintiff alleged sufficient control to withstand motion to dismiss where it alleged GM set purchase price for products); Aurigemma v. Arco Petroleum Products Co., 698 F.Supp. 1035, 1039 (D.Conn.1988) (no gasoline franchise existed where plaintiffs were free to set retail prices); Ross v. Shell Oil Co., 672 F.Supp. 63, 66 (D.Conn.1987) (no franchise where Ross had complete freedom to set retail prices). But see Aurigemma, 698 F.Supp. at 1041 (convenience store franchise existed due to numerous indicia of control that did not include power to set prices).
 
 
 51
 Other noteworthy manifestations of the control Thomas exerted over its distributors include fixing of promotions and discounts and the requirement of distributor participation, determining product mix and increasing distributors' orders on occasion to stimulate sales, controlling product placement on fresh food counters, and setting performance standards and procedures with respect to out-of-date product. The totality of all these factors evidences the significant control Thomas exerted with respect to the operations of its distributors.
 
 
 52
 In sum, we agree with the district court that plaintiffs were franchisees of Thomas, and consequently entitled to the protections of the Connecticut Franchise Act.
 
 B. Constructive Termination
 
 53
 We now address the second question, that is, whether realignment of the franchisees' territories constituted a termination of the franchises under the Act. Section 42-133f(a) provides a franchise may be terminated only for good cause and in accordance with certain notice requirements. The district court noted that total abrogation of a franchise is not required to find a termination. It rejected Thomas' assertion that plaintiffs' loss of revenues would be offset by the introduction of a new product since income from this new product would have accrued to plaintiffs even in the absence of the realignment. Concluding realignment would cause plaintiffs a loss of revenue, the trial judge held the franchises had all been constructively terminated. See 853 F.Supp. at 62-63.
 
 
 54
 We agree that total abrogation of a franchise is not required to trigger the Act's protections, but cannot agree that any negative impact on franchise income resulting from the franchisor's realignment of territories is alone sufficient to be deemed a termination. We note initially that while some plaintiffs are parties to written agreements allowing alterations to their territories, such agreements do not preclude a finding of constructive termination. The Act contains a non-waiver provision that prevents parties from contracting out of its protections. Conn.Gen.Stat. Sec. 42-133f(f). Where a realignment of territories has such a substantial effect as to be a constructive termination, a contractual reservation of the power to realign territories cannot displace the statutory scheme.
 
 
 55
 Connecticut courts have not yet held that the Act's ban on terminations--a term which the Act does not define--extends to constructive terminations. The district court relied on Carlos v. Philips Business Systems, Inc., 556 F.Supp. 769 (E.D.N.Y.1983), the only case to find a constructive termination under the Act. In Carlos, plaintiff had been an exclusive distributor of Norelco dictation equipment for parts of New Jersey, Connecticut and Ohio. In addition to the freedom from competition from other sellers of the same brand, plaintiff's status as an exclusive distributor entitled him to more favorable prices and repayment terms. The defendant notified Carlos that all exclusive distributors were to be converted to dealers, losing their freedom from competition and the other economic advantages. The district court ruled that such a change in status would cause Carlos to suffer a "substantial decline" in revenue and effectively terminate his franchise under the franchise laws of both Connecticut and New Jersey. See id. at 773, 776-77.
 
 
 56
 Although, as noted, Connecticut's courts have not spoken on whether a cause of action exists for constructive termination of a franchise, the remedial nature of the Act supports the view that such a claim lies. If the protections the Connecticut legislature afforded to franchisees were brought into play only by a formal termination, those protections would quickly become illusory. We think it reasonable therefore to believe it was the legislature's aim to have the umbrella of the Act's protection cover constructive as well as formal termination. To hold otherwise would allow franchisors to accomplish indirectly that which they are prohibited from doing directly.
 
 
 57
 Given that a claim for constructive termination may be brought under the Act, the remaining question is under what circumstances franchisor action reaches the level of constructive termination. This question should be decided in the trial court in the first instance, since the ultimate issue may turn on factually disputed matters. Because we cannot adopt the district court's view that any reduction of income resulting from a franchisor's action is sufficient for constructive termination, we must remand for reconsideration of this issue.
 
 
 58
 The following discussion offers guidance as to when a constructive termination occurs. Thomas seizes on language in Carlos stating the change in plaintiff's status "represent[ed] nothing less than the gravest threat to the viability of the business," 556 F.Supp. at 774, and the court's conclusion that Carlos' business was threatened with destruction (a finding necessary in that case to satisfy the irreparable injury prong of the test for a preliminary injunction), to suggest that constructive termination should be found only when a business is effectively destroyed. We believe a "near-destruction" requirement is too narrow. Such a restrictive test would ill-serve the purposes of the Act. A franchisor may take action that results in less than the complete destruction of a franchisee's business, but yet so greatly reduces the value of the franchise as to epitomize the very abuse of disparity in economic power that the Act seeks to prevent.
 
 
 59
 Also attempting to fit within Carlos, plaintiffs point to its language holding that the loss of exclusive distributorship status effectively terminates a franchise. In Carlos the loss of exclusive status meant plaintiff would now be competing with all other sellers of Norelco dictation equipment, including the franchisor. The court accordingly found Carlos would be subject to "ruinous competition." Id. at 774. But here, unlike in Carlos, the distributors still have exclusive territories--they are the only distributors of Thomas baked goods to the stores they serve. Plaintiffs' claim is that they have lost the exclusive distribution rights over their original territories, but this is a change of territory not of status. Although the composition of their customer base may have changed, plaintiffs have not lost their status as exclusive suppliers of Thomas goods within their territories.
 
 
 60
 A constructive termination may be easy to discern where, for instance, a franchisor attempts to drive its franchisee out of business, see Remus v. Amoco Oil Co., 794 F.2d 1238, 1240-41 (7th Cir.), cert. dismissed, 479 U.S. 925, 107 S.Ct. 333, 93 L.Ed.2d 345 (1986), or refuses to continue doing business with its franchisee, see American Business Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1141 (8th Cir.1986). At the other end of the spectrum, were every minor alteration of the franchise that resulted in a decrease in income deemed a constructive termination, the franchise form of doing business would lose its usefulness to franchisors. It is certainly not the will of the Connecticut legislature to afford such a high level of protection to franchisees as to drive franchisors from the state. See Grand Light & Supply Co., 771 F.2d at 677 (declining an interpretation of the Act that would result in "legislative overkill" and "unjustifiably interfere with the normal functioning of the marketplace").
 
 
 61
 As a consequence, it appears that something greater than a de minimis loss of revenue--and less than the stark scenario of driving a franchisee out of business--must be shown in order to justify a finding of constructive termination. We think such may be found when a franchisor's actions result in a substantial decline in franchisee net income. Such analysis will be strictly financial, except in close cases, where non-financial factors may have some bearing. Whether a decline in net income is substantial will necessarily depend on the particular facts and must be determined on a case-by-case basis.
 
 
 62
 The parties' briefs refer to competing trial exhibits and to affidavits submitted in opposition to post-trial motions (which were not before the district court when it concluded that a constructive termination occurred) to show variously that the distributors' business has increased as a result of the realignment, or decreased only slightly, or decreased significantly. The final determination as to whose figures are the most accurate requires factual and credibility findings and should be dealt with by the district court on remand. Without expressing any view on the accuracy of their calculations, we note the Ahlquist plaintiffs' estimate that on the low end the realignment will cause, in one case, an annual loss of 12 percent of income, and in another case an annual loss of about $6,000. In light of the above discussion, such amounts do not in our estimation meet the test of a substantial decline in income, in either absolute terms or as a percent of income, so as to justify a finding of constructive termination.
 
 
 63
 We agree with the trial court that absent the realignment the plaintiffs would still have been able to sell Sandwich Size English Muffins (the new product), and therefore that the necessary comparison should account for this change in product mix. Plaintiffs are additionally entitled to show, if such is the case, that promotions of all Thomas products, done as part of the introduction of the new product, caused sales of these other products to increase in the short term and that such increase has not been sustained. On the other hand, as is the case where expenses not incurred due to a breach of contract are offset from lost profits, see generally Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir.1995), to the extent that the realignment has resulted in increased sales due to the increased service frequency or decreased costs to distributors due to the shorter distances they must travel, these effects should be accounted for in Thomas' favor.
 
 
 64
 C. "Good Cause"
 
 
 65
 Having found that plaintiffs hold franchises protected by the Act, and that some plaintiffs may be entitled, on remand, to prove that they were constructively terminated by Thomas, we reach defendant's contention that any termination was for "good cause." Thomas avers its legitimate business reasons can constitute good cause for termination under the Act. The plaintiffs, on the other hand, contend, and the district court so held, that good cause can only be found in non-performance by the franchisee. See 853 F.Supp. at 63. Because this reading of the statute is at odds with its plain language and history, we hold that good cause is not limited to proving contractual breaches of the franchise agreement, but may be based on a franchisor's legitimate business reasons.
 
 
 66
 Statutory construction seeks to carry out the legislature's purpose as expressed in the language it used in the statute. See Negonsott v. Samuels, --- U.S. ----, ----, 113 S.Ct. 1119, 1122-23, 122 L.Ed.2d 457 (1993); Norfolk & Western Ry. v. American Train Dispatchers Ass'n, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991). The Act states in relevant part, "[n]o franchisor shall ... terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement...." Sec. 42-133f(a) (emphasis added).
 
 
 67
 The language of the Act leaves no doubt that good cause exists when the franchisee materially breaches the agreement. Equally clear is the legislature's plan that the meaning of good cause is broader than franchisee breach. The district court read the "shall include, but not be limited to" language as setting forth an illustration limiting good cause to those events that stem from franchisee malfeasance. But such an interpretation cannot be derived from the language of the Act. If the Connecticut legislature intended good cause to result only from franchisee breach, it failed to use language expressing such a policy decision.
 
 
 68
 The legislative history supports a broader view of the phrase "good cause." The original Act prohibited termination, except for good cause, without defining or otherwise illustrating the concept. See Conn.Public Act 73-500. The uncertainty over good cause gave great concern to franchisors, especially oil companies concerned about the high value of the real estate leased to franchisees. See Conn. Joint Standing Comm. 1973-1974 Sess., 270-75. This concern resulted in the Act being amended in a number of ways, including adding the current language showing that good cause encompasses more than franchisee breach. In effect, the amendments were the Connecticut legislature's acknowledgment that franchisors' economic interests must be accounted for in striking a balance between franchisee protection and attracting and retaining franchisors to do business in the state.
 
 
 69
 In addition to the Act's language and history, it is helpful to examine whether similar statutory schemes have been construed as we read the Act. See State Distributors, Inc. v. Glenmore Distilleries Co., 738 F.2d 405, 413 (10th Cir.1984) (federal courts interpreting state franchise laws where state courts have not spoken looked to construction of similar language in federal Automobile Dealers' Day in Court Act, protecting automobile dealers, and franchise protection laws in other states). These other statutory schemes take into account the economic decisions of the franchisor in the "good cause" calculus. For instance, the federal Automobile Dealers' Day in Court Act, 15 U.S.C. Sec. 1221 et seq., does not " 'curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise.' " Woodard v. General Motors Corp., 298 F.2d 121, 128 (5th Cir.) (quoting H.R.Rep. No. 2850, 84th Cong., 2d Sess. 9, reprinted in 1956 U.S.C.C.A.N. 4596, 4603), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962).
 
 
 70
 Similarly, the Supreme Judicial Court of Massachusetts rejected an argument that the Massachusetts franchise law prohibiting termination without "due cause" was limited to dealer breaches and did not include suppliers' good faith business decisions. See Amoco Oil Co. v. Dickson, 378 Mass. 44, 389 N.E.2d 406, 407-08, 410 (1979) (to require suppliers to continue unprofitable marketing agreements with dealers imposes substantial hardship on suppliers); accord General Aviation, Inc. v. Cessna Aircraft Co., 13 F.3d 178, 183 (6th Cir.1993) (although Michigan franchise law protects franchisees, it does not " 'impose an eternal and unqualified duty of self-sacrifice upon every grantor that enters into a distributor-dealership agreement' or to 'insulate dealers from all economic reality at the expense of grantors' " (quoting Ziegler Co. v. Rexnord, Inc., 147 Wis.2d 308, 433 N.W.2d 8, 11, 12 (1988))); State Distributors, Inc., 738 F.2d at 413 ("The [New Mexico] Franchise Act is not to be read as forcing a particular supplier and distributor to deal with one another despite irreconcilable conflicts in marketing philosophies, nor can it be read so as to require the court to second-guess the business judgment of the supplier in terminating such a franchise.").
 
 
 71
 Our reading of the Franchise Act is further supported by comparing it to an example of a franchise law of a state taking a narrower view of those circumstances justifying termination. For instance, in New Jersey "good cause ... shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J.Stat.Ann. Sec. 56:10-5 (West 1989); see Westfield Centre Serv. Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 432 A.2d 48, 55 (1981). This statute reflects a legislative decision to protect franchises even at the cost of limiting the legitimate business decision-making of franchisors. The Connecticut Act does not contain a like limitation.
 
 
 72
 Allowing the legitimate business concerns of a franchisor to be a part of the "good cause" equation does not require a showing of unprofitability. Such a requirement would make the balance between franchisor and franchisee fanciful. A seller of goods in the marketplace is justified in identifying untapped opportunities or unutilized potential and adjusting its distribution network to realize greater profits. When the franchisor demonstrates that its business decision is legitimate and made in good faith--even if shown by hindsight to be made in error--a court should not replace the grantor's decision with its own. See State Distributors, Inc., 738 F.2d at 413.
 
 
 73
 In the case at hand Thomas determined it could increase sales by increasing service frequency. This result it thought best accomplished by rationalizing its distributors' haphazard routes. The Act protects franchisees from the arbitrary exercise of the franchisor's greater economic strength. But this case does not concern such arbitrary action. Here we are faced with a legitimate business need to increase sales and the steps taken to further that goal. Thomas' goal of increasing sales constitutes "good cause" within the meaning of the Franchise Act. Thus, the Act does not prevent defendant from realigning plaintiffs' territories.
 
 IV Remedy
 A. For Breach of Contract
 
 74
 We turn finally to the remedy available to plaintiffs. Plaintiffs Nardello, Petereit, Pitrone, Lonergan, Strasser and Adkins, by acquiescing to Thomas' distributorship confirmation letters, entered into agreements with Thomas in which they agreed to service territories that were not permanent. The realignment of their territories was therefore provided for in their contracts and no breach will occur by carrying out the route changes. Plaintiffs Ahlquist, Anderson, Desso and SanAngelo had only oral agreements with Thomas, under which the district court found they were promised unalterable territories. Thus, Thomas' unilateral alteration of these plaintiffs' territories will constitute a breach of contract.
 
 
 75
 In Connecticut, as elsewhere, the general rule of damages in a breach of contract case is an award designed to place the injured party in the same position that party would have occupied had the contract not been breached. See West Haven Sound Dev. Corp. v. City of West Haven, 201 Conn. 305, 514 A.2d 734, 742 (1986); see generally Indu Craft, Inc., 47 F.3d at 495. The remedy is the profits lost as a result of the breach. In the present case the district court, without discussing the possibility of damages, issued a permanent injunction. Of course injunctive relief where an adequate remedy at law exists is inappropriate. Our oft-cited case of Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir.1979) (per curiam), is particularly relevant. Jackson Dairy was the exclusive distributor of certain Hood products in a section of Vermont. Jackson's customers included local stores of two supermarket chains, Grand Union Co. and First National Stores, Inc. Jackson sued for an injunction when Hood began supplying the chain stores with Hood products destined for retail outlets in Jackson's territory. Jackson alleged breach of its exclusive distributorship agreement and the district court granted a preliminary injunction. We reversed the grant of an injunction because money would adequately compensate Jackson for its losses if a breach was proven. See id. at 72.
 
 
 76
 In the case at hand, where the distributors have lost certain stores and gained others, it is equally clear that lost profits are readily determinable. Thus, an adequate remedy at law exists. See id.; see also C-B Kenworth, Inc. v. General Motors Corp., 675 F.Supp. 686, 687 (D.Me.1987) (claim for lost profits and injury to goodwill allegedly resulting from cancellation of truck franchise compensable at law); Lafayette Beverage Distrib., Inc. v. Anheuser-Busch, Inc., 545 F.Supp. 1137, 1151 (N.D.Ind.1982) (beer distributor's lost sales and injury to goodwill provable in dollar amounts, therefore adequate remedy at law exists); P.J. Grady, Inc. v. General Motors Corp., 472 F.Supp. 35, 37 (E.D.N.Y.1979) (loss of Buick dealership by car dealer selling Buick and Chevrolet automobiles is readily compensable by monetary damages). Ahlquist, Anderson and Desso--who unlike SanAngelo did not benefit from a stay of the realignment--are entitled to those damages they can prove from April 26, 1993--the date the realignment became effective--until November 3, 1993, the date of the entry of the judgment ordering the injunction to issue. More importantly, these four plaintiffs are entitled to recover all future damages that will result from the realignment, unless these plaintiffs can show, under the standard discussed in the next paragraph, that they are entitled to an injunction, or unless the defendant elects to rescind the realignment.
 
 
 77
 Although we rule that the injunction improperly issued, on remand SanAngelo, Ahlquist, Anderson, and Desso may show that the lost profits resulting from a realignment by Thomas are of such magnitude as to threaten the viability of their businesses. Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury. See Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp., 992 F.2d 430, 435 (2d Cir.1993). Upon such a showing, plaintiffs may be entitled to injunctive relief. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970) (temporary injunction pending litigation proper where dealership completely terminated); Automotive Elec. Serv. Corp. v. Association of Automotive Aftermarket Distribs., 747 F.Supp. 1483, 1513-14 (E.D.N.Y.1990) (permanent injunction issued where, under the circumstances, loss of one-third gross sales that would result from termination threatened existence of business); cf. C-B Kenworth, Inc., 675 F.Supp. at 687-88 (where GMC truck sales accounted for less than five percent of total gross profits, termination does not threaten ability to continue in business, therefore no irreparable injury); Lafayette Beverage Distrib., Inc., 545 F.Supp. at 1151 (no irreparable injury for termination of beer distributorship where Anheuser-Busch products constituted only 28% of sales).
 
 B. Under the Franchise Act
 
 78
 Plaintiffs' distributorships are franchises within the scope of the Franchise Act. Having said that, it must be observed that only those plaintiffs for whom the realignment brought about such a substantially adverse economic change as to constitute constructive termination of their franchises are entitled to protection under the Act. That protection is limited to the procedural protections of the Act since Thomas' legitimate business reasons constituted good cause for termination, permitted under the Act. For those distributors not found to have been constructively terminated, the Act affords them no protection at all from realignment.
 
 
 79
 Hence, the remedy is restricted to making the constructively-terminated plaintiffs whole for the violation of the procedural provisions of the Franchise Act; particularly the notice requirements. Those constructively-terminated plaintiffs not given the requisite 60-days notice are entitled to damages for lost profits during the time the realignment was in effect without the requisite notice, unless they have already been compensated by the breach of contract claim. In addition, Thomas may be enjoined to compel future compliance with the procedural requirements of the Act.
 
 CONCLUSION
 
 80
 Accordingly, the permanent injunction barring Thomas from unilaterally realigning plaintiffs' territories is vacated. The case is remanded to the district court for it to determine whether any of the plaintiffs were constructively terminated under the Franchise Act, and to determine damages resulting from Thomas' breach of contract with certain plaintiffs, and for such other relief as is consistent with this opinion.
 
 
 81
 Affirmed in part, reversed in part, and remanded.
 
 KEARSE, Circuit Judge, dissenting in part:
 
 82
 I respectfully dissent from so much of the majority decision as vacates the judgment with respect to plaintiffs Robert Petereit, Robert J. Nardello, David Lee Adkins, James Michael Lonergan, Anthony Frank Pitrone, and John Alan Strasser. In the majority's view, "the district court made no findings as to whether Thomas and the distributors intended the confirmation letters to be integrated agreements," ante at 1178. It seems to me that such findings are implicit, if not explicit, in the court's Memorandum of Decision.
 
 
 83
 For example, the court found that "[b]etween plaintiffs and defendant there was an understanding, an agreement, a contract. It was not written." Again, it found that "[c]learly a contract exists between defendant and plaintiffs. Though writings have surfaced, no single document has articulated the understanding of the parties." These appear to be findings that there was no integrated written agreement.
 
 
 84
 The district court also found that the Independent Contractor Agreements ("ICAs"), which were used after 1984, were not contracts, for it found there had been no acceptance of their terms either affirmatively or by implicit acquiescence. In a passage that appears to deal with both ICAs and the earlier letters, the court stated as follows:
 
 
 85
 Plaintiffs, supported by independent testimony and assurances of several district sales managers, were led to believe the stores to which they were assigned were assured so long as they serviced them properly. Defendant's claim that this did not preclude its unilateral right to alter store assignments is not credited. An earlier proposed unilateral realignment was not pursued in the face of distributor opposition. Other reallocations were made by agreement. An Independent Contractor Agreement ... came to be used with distributorships, starting in 1984. No plaintiff was requested to sign such out of concern that they would refuse to do so. Defendant thereby tacitly acknowledged that it could not unilaterally dictate the terms of its arrangements with its distributors. The letter, delivered to some plaintiffs ... did not purport to bind plaintiffs. Indeed ... not calling upon them to sign an ICA suggests the contrary.... The attempts to bind plaintiffs by reading the letter to them and announcing that its terms would control their distributorships are unavailing to alter preexisting relationships.
 
 
 86
 (Emphasis added.)
 
 
 87
 In sum, I read the district court's opinion as finding that there was an oral agreement between Thomas and the distributors; that the agreement assured the distributors of their respective territories so long as they serviced them properly; that the agreement did not include the reservation to Thomas of the right unilaterally to alter the distributors' territories; that Thomas knew that the distributors would not agree to such a reservation and for that very reason did not expressly ask them to sign such a written agreement; and that the distributors did not acquiesce in any unilateral statement by Thomas purporting to reserve to itself the right to change their territories. As the majority opinion notes, whether the parties intended a writing to be an integration of their oral agreement presents a question of fact. I am not persuaded that the trial court here made no findings as to whether Thomas and the distributors intended the confirmation letters to be integrated agreements. I agree of course that if a person conducts himself so as to lead the other party reasonably to conclude that he is accepting an offer to contract, an acceptance has occurred and there is a contract containing those terms. But here, the district court in essence found as a matter of fact that it was not reasonable for Thomas to conclude that the distributors accepted its unilateral reservation; indeed, it found that Thomas had declined to send specific contracts precisely because Thomas knew they would be rejected.
 
 
 88
 The majority's conclusion as a matter of law that the plaintiffs who received confirmation letters acquiesced in them as integrations of the parties' agreement thus seems to contradict the district court's findings. Given the Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), standard of review, under which the factfinder's assessments of witness credibility and its choice between competing factual inferences can virtually never be clear error, see id. at 573-75, 105 S.Ct. at 1511-12; Fed.R.Civ.P. 52(a), I do not believe we are entitled to overrule the findings of the district court in the present case.
 
 
 
 [1]
 The specific timing for each plaintiff who received a letter is as follows: Nardello began delivering goods on June 26, 1966. Ten days later, on July 6, he met with a Thomas official, and the confirmation letter was dated July 8, 1966. Petereit met with a Thomas official on October 15, 1968, a letter confirming the terms of the agreement was dated October 18, 1968, and he began delivering goods on October 21. Pitrone's meeting occurred on February 28, 1974 and he was delivering products by March 11, 1974. The confirmation letter to him was dated March 25, 1974. With respect to Lonergan and Adkins, their letters do not refer to meeting dates, but in each case the confirming letter was dated four days after the commencement of the distributorship on October 16, 1977 and April 8, 1984, respectively. The letter to Strasser is undated and confirms a meeting occurring on an unspecified date. Strasser began distributing products on April 27, 1977
 
 
 [2]
 The district court found that Thomas (1) designated distributors and stores to be served including all stores of a chain even when unprofitable; (2) ordered the wearing of uniforms; (3) enforced standards at the depots and on trucks; (4) set product prices and shelf life; (5) fixed promotions and discounts, including distributor participation, arranging same with chain stores directly; (6) mandated distribution of only and all of defendant's products; (7) required five deliveries per week to chain stores on days it specified; (8) set the amount and mix of product for delivery to stores; (9) determined product shelf arrangement; (10) inspected stores for adequate shelf stock, product mix, product and proper product display; (11) arranged with chain stores for shelf space and promotion displays; (12) arranged product promotions, many of which required distributor participation; (13) specified accounting records for chain store accounts; (14) reserved the right to require a sub-distributor be hired and to veto substitute drivers; (15) supervised distributors by managers riding routes; (16) promulgated performance standards; (17) mandated type and size of delivery truck; (18) dictated distributor's product orders; (19) mandated disposition of out-of-date product; (20) contributed to a uniform cost once and provided materials for distributors' use and displays; (21) scheduled and conducted sales meetings; (22) made distributorships non-transferable; (23) authorized, but did not mandate, the use of defendant's trade-mark on trucks and uniforms. See 853 F.Supp. at 61. Of these factors indicating control, only one was legally not relevant to the district court's finding that plaintiffs operated under a marketing plan imposed by Thomas. That distributors sold only Thomas' products goes to the "substantial association" prong of the franchise definition. See Muha, 433 A.2d at 1012